# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**JOHN DOE**

:
:
:
:
:

*Pro Se Plaintiff*

:
:

**4:19-CV-1438**

:
:

**v.**

:

CIVIL CASE NO:
(to be supplied by Clerk
of the District Court)

:
:

**THE PENNSYLVANIA STATE
UNIVERSITY, THE PENNSYLVANIA
STATE UNIVERSITY BOARD OF
TRUSTEES; KAREN FELDBAUM, in
her individual and official capacity**

:
:
:
:

JURY TRIAL DEMANDED

:
:
:

*Defendants*

:
:
:
:

**FILED**
HARRISBURG, PA

AUG 19 2019

Per _____
Deputy Clerk

## COMPLAINT

## INTRODUCTION

Plaintiff, John Doe[1], a current Penn State student files this civil rights lawsuit under

Section 1983 and the Due Process Clause of the 14th Amendment to the United States, seeking

damages and invalidation of a Conduct Prohibition sanction. This sanction and the disciplinary

record were the product of a constitutionally flawed student conduct hearing process that

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff has filed a Motion for Permission to Proceed under Pseudonym, seeking permission of the Court to proceed anonymously given the sensitive and private nature of the matters alleged herein (Mr. Doe's protected health information was improperly disclosed). As more fully set forth in the Motion, The University is fully aware of the actual identities of John Doe and will not be prejudiced by John Doe's use of those pseudonyms for public filings.

1

deprived Mr. Doe of the most basic due process protections. Penn State provided Mr. Doe an

unfair and biased tribunal and deprived Mr. Doe of meaningful opportunity to respond, explain,

and defend, which made Mr. Doe impossible to prevail. In addition, Penn State breached its duty

of providing a civil and educational environment and breached the contract with Mr. Doe.

Defendant Feldbaum retaliated against Mr. Doe by invading Mr. Doe's privacy. Penn State and

Defendant Feldbaum assisted dishonest academic practice and enabled faculty misconduct.

## PARTIES

1.   Plaintiff John Doe is an international student, arrived at the United States in 2017 to

start law school. He is currently a second-year law student at Penn State Law at the Pennsylvania

State University, University Park, Pennsylvania.

2.   Defendant The Pennsylvania State University ("Penn State") is an educational

institution established and operated by the Commonwealth of Pennsylvania with its principal

place of business at 201 Old Main, University Park, Pennsylvania. Penn State operated under the

color of state law at all times relevant to the complaint.

3.   Defendant Karen Feldbaum ("Feldbaum") is the interim senior director for Office of

Student Conduct, the co-chair of Penn State Academic Integrity Task Force, and Member of

Behavioral Threat Management Team. Defendant Feldbaum served as an executive assistant to

the vice provost for educational equity, liaised for the vice provost's office, the Lesbian, Gay,

Bisexual Student Association, and the Graduate Student Coalition. Defendant Feldbaum is

responsible for Mr. Doe's student disciplinary process. Defendant Feldbaum is being sued in her

individual and official capacity.

## JURISDICTION AND VENUE

1.  This Court has federal question, diversity, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and 28 U.S.C. § 1367 because (i) Plaintiff's claims arising under the United States Constitution and 42 U.S.C. §§ 1983 and 1988 pursuant to 28 U.S.C. §§ 1331 and 1343; and (ii) the state law claims are so closely related to the federal law claims as to form the same case controversy under Article III of the United States Constitution.

2.  This Court has authority to issue the declaratory and injunctive relief sought in this matter pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and Federal Rules of Civil Procedure 57 and 65.

3.  This Court has venue for this claim pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim, including the disciplinary hearing and appeal, occurred in this district.

## FACTS

**A. Defendant Feldbaum's repeated public expression of bias against international student before, during, and after Defendant Feldbaum assumed responsibility of Mr. Doe's disciplinary hearing process was condemned by the University Senate Committee.**

1.  Defendant Feldbaum is the highest-ranked personnel at the Office of Student Conduct. Defendant Feldbaum is the only officer from the Office of Student Conduct who also serves as a member of the Penn State Academic Integrity Task Force.

2.  Defendant Feldbaum, with an interview with the assistant director of Admission Services and Financial Aid at Penn State World Campus, stated that Defendant Feldbaum "meets

face-to-face with some of the more serious cases or those that have been elevated by the lower level case managers or graduate interns." Defendant Feldbaum also stated that "the only students I see are the students that mess[ed] up," acknowledged that "the nature of the work can be very discouraging." Defendant Feldbaum stated that "knowing that you can respect and give respect to people, even when they screw up, is important." [2]

3.  According to the available statistics by Penn State, among 97136 enrolled students, 9888 are international students[3]. Among 9888 international students, 2945 students are in the graduate program. [4]

4.  According to Penn State, Office of Student Conduct is dedicated to supporting the student by "administering a process that teaches responsibility by holding students accountable for their behavior, encourages the expression of diverse views and opinions, and validates healthy choices and the concepts of individual and community respect." [5]

5.  According to a new job post describing Defendant Feldbaum's current position posted on January 21, 2019, by Penn State, Penn State's Office of Student Conduct manages approximately 2,700 cases at University Park, and the Senior Director provides leadership regarding complex legal and regulatory issues for students in higher education and works closely with many on-and off-campus partners. The Senior Director reports to an Assistant Vice President for Student Affairs. Responsibilities will include: Directs day-to-day operation of the University's conduct process, which may include the following: serving as a case manager for

---

[2]  https://sites.psu.edu/lauraanderson/informational-interview/

[3]  https://global.psu.edu/dissastats; https://stats.psu.edu/

[4]  https://global.psu.edu/dissastat

[5]  https://studentaffairs.psu.edu/conduct

serious cases; overseeing the management of the administrative process; providing ongoing evaluation of student conduct; managing and overseeing the case assignment process; assuring that all cases are heard in a fair, equitable, and timely manner; and managing communications related to student conduct. Develops policy consistent with local, state, and federal law and guidance. Serves as primary interpreter of the Code of Conduct. Oversees compliance with federal and state mandates. Qualifications include: understanding Student Affairs roles and committed to a developmental model of student conduct on college campuses; thorough knowledge of state and federal legal issues related to higher education and student conduct; knowledge of [… ] federal laws and guidance related to student conduct work; strong verbal, written, and interpersonal communication skills; ability to manage confidential and sensitive situations; ability to interact comfortably with a wide range of diverse people, including staff, students, faculty, and parents; ability to function as an integral team member with Student Affairs; familiarity with databases and computer software programs and commitment to professional ethics. [6]

   6.   Commissioned in April 2017, Penn State Academic Integrity Task Force's purpose was to update outdated policies and keep up to pace with changing times. [7]

   7.   On January 29, 2019, as the co-chair of the Academic Integrity Task Force, Defendant Feldbaum discussed Academic Integrity Task Force's Final Report. Defendant Feldbaum's proposal was to target international students, claimed international students were "not represented disproportionately" in academic infraction cases because some cultures

---

[6]   https://psu.jobs/job/85239

[7]   https://onwardstate.com/2019/01/24/penn-state-academic-integrity-policy-nears-overhaul/

"understand academic integrity differently." [8]  Defendant Feldbaum's comment was condemned

by university-wide faculty members. Comments include singling out a group of students (here:

international students) on the prejudiced assumption that they are more likely to commit

infractions is wrong, especially if that assumption is directly contradicted by the data. Other

comments include certain matters handled under a "standardized university-wide" system is

"problematic," and "ought really to be the faculty who receive training on matters of academic

integrity."

8.   On March 12, 2019, The Faculty Senate Committee on Educational Equity and

Campus Environment wrote a response to Defendant Feldbaum's Task Force Report. The

Faculty Senate Committee viewed Defendant Feldbaum's proposal "could potentially reinforce

or exacerbate extant inequalities." The Committee found "the Task Force's report demonstrates a

notable degree of bias toward international students," found Defendant Feldbaum's proposal to

"isolat[e] international students from the rest of the student population has the potential to

alienate them and reinforce domestic, nativist biases held against them, resulting in the further

stigmatization of international status. " The Faculty Senate reiterated comments made on January

29's senate meeting that the data provided in the report is "unclear or even double" "if

international students are really committing academic integrity violations in greater numbers

than domestic students."

9.   The Faculty Senate also found Defendant Feldbaum's proposal "seem to use the

criminal justice system as a template," "reflect an uneasy similarity to penal sentencing

guidelines, which treat students more as offenders than learners." "The treatment of students as

---

[8]  http://senate.psu.edu/senators/standing-committees/educational-equity-and-campus-environment/meeting-minutes/

"offenders" within our AI system **has caused some faculty to misconstrue their role in upholding AI standards, acting more as zealous criminal prosecutors than as educators**, and has led, by the Task Force's own discovery, to situations of improper adjudication and excessive punishment." In the Task Force's engagement with stakeholders, some faculty indicated that they purposefully did not take part in the AI reporting process "to make sure offenders receive a strong set of consequences." The Task Force also revealed that "[t]he current system results in situations in which students accept severe penalties for minor violations." [9]

10. On March 12, 2019, the entire University senate voted on committee's report responding to Defendant Feldbaum's proposal. The senate chair commented, "this report touches the lives potentially of every single student and faculty member at Penn State." The committee's report received 120 accepts, and 21 rejects and was forwarded to University President Barron for his action. [10]

### B. Counseling and Psychological Services at Penn State encourage student seeking help in difficult times, ensures confidentiality, and both Defendant Feldbaum, and Professor Mathews are aware of this fact.

11. Penn State promotes university's Counseling and Psychological Services (CAPS). The law school, as well as university, promotes weekly "CAPS(Counseling and Psychological Services)" chat, and students are reassured that CAPS(Counseling and Psychological Services) chat meetings are "private," information discussed is "confidential." [11]

12. Law school actively promotes student's speaking with counselors in the law school

---

[9] http://senate.psu.edu/senators/agendas-records/march-12-2019-agenda/appendix-g/

[10] https://senate.psu.edu/files/2014/06/Final-Record-3-12-2019-1mwhihl.pdf

[11] https://studentaffairs.psu.edu/counseling/wellness-services/caps-chat

building about any concerns.









13. Penn State Student Affairs acknowledged "participating in the conduct process can be a challenging experience for any student." [12]

14. Penn State states, "Please aware that information about a student currently receiving services cannot be released or acknowledged without a signed release form in compliance with HIPAA." [13]

15. Under Penn State Counseling and Psychological Services Notice of Privacy Practices, Penn State states: "Information shared with the therapist is held in the strictest confidence consistent with professional and ethical standards and state and federal law. Therapists will not release information without the client's signed consent except in rare instances where sharing is required by law." More specifically, under judicial or administrative proceedings section, Penn State states: "If you are involved in a court proceeding and a request is made about the professional services we provided you or the records thereof, such information is privileged under state law, and we will not release the information without your written consent, or a court order. The privilege does not apply when you are being evaluated for a third party or where the evaluation is court ordered. You will be informed in advance if this is the case."

16. Mr. Doe did not sign a release form **at any time**.

17. On March 14, 2019, Defendant Feldbaum wrote an email to Mr. Doe using university email system "**I spoke with CAPS [Counseling and Psychological Services] this morning and they are willing to continue to meet with you on a regular basis. For you to complete this sanction, you would need to sign a release so that I can verify your participation.**"

18. The university has not informed Mr. Doe any of Defendant Feldbaum's misuse of Mr.

---

[12] https://studentaffairs.psu.edu/support-safety-conduct/student-conduct/advisors-attorneys

[13] https://york.psu.edu/student-life/services/personal-counseling/resources-for-faculty-staff-family

Doe's confidential information.

19. In one of Professor Mathews' syllabus, Professor Mathews wrote services provided by University are "confidential and provided by trained professionals. I am not a trained professional in mental health matters, but you should feel free to talk with me as well, and I will work with you to get you the help you need."

### C. Mr. Doe had multiple disagreements regarding Professor Mathews' research ethic and his treatment of Mr. Doe and materialized the disagreements in the email.

20. Mr. Doe came to the United States in 2017 for the first time to start law school. Jud Mathews, Judkins Cooper Mathews, Judkins Mathews, ("Professor Mathews") was Mr. Doe's civil procedure professor.

21. At times relevant to this complaint, Professor Mathews was an associate professor of law at Penn State Law and was promoted to associate dean of research and partnership on Spring, 2019.

22. Mr. Doe helped Professor Mathews' research during his first year in exchange for Professor Mathews' time.

23. Mr. Doe sent small gifts to his first-year law professors to celebrate his first year in the United States. Only Professor Mathews responded overenthusiastically by asking both of his sons to write a hand-written note to Mr. Doe.

24. Professor Mathews' is aware of Mr. Doe's tremendous respect toward the professor and was flattered by Mr. Doe's admiration.

25. Mr. Doe referred Professor Mathews as a father figure, and Professor Mathews acknowledged such compliment, offered to "become Mr. Doe's protector" throughout his law school career. Professor Mathews did not take Mr. Doe's admiration as an issue before the

disciplinary process.

26. On April 3, 2018, Professor Mathews wrote to Mr. Doe to apologize for his "brusque" and "upsetting" behavior after Professor Mathews got angry at Mr. Doe.

27. On April 22, 2018, Mr. Doe proposed to create a website under Professor Mathews' name ("judmathews.com") showcasing some of Professor Mathews work in one professor's departure party outside of law school. Professor Mathews agreed if Mr. Doe can get a good deal. Mr. Doe used some of his points redeemed from Lexis to purchase the domain.

28. On April 26, 2018, Mr. Doe informed Professor Mathews regarding the domain purchase transaction. Professor Mathews was unhappy with the arrangement without stating the exact reason. Mr. Doe offered to give the domain to Professor Mathews as a gift, but Professor Mathews refused and offered to pay using an online broker. When Mr. Doe pointed out if Mr. Doe accepts money, he would be in violation of federal law for purchasing a domain for the sole purpose of reselling, and in violation of contract with Lexis, for reselling points in exchange for money, Professor questioned Mr. Doe that whether Mr. Doe want to anger him or break the law and the break the contract with Lexis.

29. On April 27, 2018, when replying to Mr. Doe's email that "this matter should be discussed as soon as possible," Professor Mathews wrote to Mr. Doe "the whole thing doesn't matter that much."

30. On May 2, 2018, Professor Mathews agreed that he would accept the domain as a gift, writing to Mr. Doe, "the situation is satisfactory."

31. On May 7, 2018, after Mr. Doe merely expressed some interest in other professor's work, Professor Mathews got extremely upset, wrote an email to Mr. Doe, writing Mr. Doe that he can work for another professor.

32. On May 14, 2018, Mr. Doe started working for Professor Mathews as his first-year summer job. Mr. Doe worked on Professor Mathews' administrative law casebook and an academic book right after Mr. Doe's final exam.

33. During Mr. Doe's summer with Professor Mathews, when Mr. Doe can not find the exact authors that correspond with Professor Mathews' assertion, Professor Mathews would encourage Mr. Doe to make citation up because the materials are in a foreign language; therefore no one will check.

34. On July 2, 2018, Mr. Doe stated because he was using opinion texts from the public domain and doublechecking copyright issues, the process can be long and frustrating. Professor Mathews stated he doesn't have the energy to motivate Mr. Doe, and asked Mr. Doe to copy directly from a commercial database ("Lexis" and "Westlaw") and remove proprietary materials and fake it as if such cases are from public source to save time. When Mr. Doe expressed uncomfortableness in this practice, stated commercial databases have typos in the old cases corrected, which will make such fraudulent practice discoverable, Professor Mathews replied that materials prepared for Penn State Law won't receive that level of scrutiny, even though anyone can access the materials, and Professor Mathews was thinking about contracting with a casebook publisher. After Mr. Doe repeatedly stated his unwillingness to comply and asked for more time so Mr. Doe can work under his ethical standard, Professor Mathews yelled he can't motivate Mr. Doe on this aspect and threw a pen at Mr. Doe.

35. Mr. Doe, to find a confidential support line to sort out the issues, called Counseling and Psychological service at Penn State to seek additional support in navigating resources at Penn State. Mr. Doe was assured that the information will be strictly confidential and was advised to stop working for Professor Mathews.

36. On July 6, 2018, Mr. Doe wrote Professor Mathews that he wanted to discuss "Monday's pen incident." Professor Mathews refused to discuss this matter over the email and insisted on a video conference.

37. On July 12, 2018, Professor Mathews initiated a video conference, which is the first communication between Professor Mathews and Mr. Doe, since Mr. Doe wrote to Professor Mathews regarding the pen incident. Professor Mathews told Mr. Doe that the video chat would be recorded. In the video conference, Professor Mathews stated he didn't like Mr. Doe's tone and threatened Mr. Doe by stating that since this is Mr. Doe's summer job, he will have a lot of say in Mr. Doe's future employers, stating "what can I honestly convey to an employer? Potential employer contacts me, it's better from my perspective." Professor Mathews also threatened that he didn't want any gap in Mr. Doe's resume.

38. Mr. Doe believed the ethical issues could be resolved if Mr. Doe insisted on his ethical standard and work longer hour without getting paid. Mr. Doe also felt extremely threatened by Professor Mathews' statement regarding Mr. Doe's potential employer.

39. Approaching the end of summer, Professor Mathews' changed his idea about the domain again, asked Mr. Doe to sell him the domain. Mr. Doe reiterated that such a practice would be breaking the contract with the provider. Mr. Doe proposed to relinquish the domain. Professor Mathews strongly opposed to the idea.

40. On August 7, 2019, Professor Mathews and Mr. Doe agreed to terminate their relationship. Professor Mathews agreed that Mr. Doe could use Professor Mathews' nickname "JUD" as the name of Mr. Doe's project. On the same day, Professor Mathews abruptly asked Mr. Doe that Mr. Doe should stop working for him, and asked to hear Mr. Doe play piano on Thursday or Friday.

41. Sensing another change of mind, Mr. Doe finally wrote Professor Mathews that he should stop any interaction with Mr. Doe, and if necessary, allow the student dean to intervene to resolve remaining issues.

42. Because the first day of class was approaching, Mr. Doe decided to put up a mock website, demonstrating his next project.

43. Mr. Doe insisted on gifting the domain to Professor Mathews, without payment to avoid hassle throughout, but for some unknown reason, Professor Mathews strongly disagreed.

44. The first day of class was August 15, 2018.

**D. After Mr. Doe asked Professor Mathews to stop contacting him, Mr. Doe was asked to meet with Academic dean and associate dean of the law school. No disciplinary charges were made against Mr. Doe.**

45. On August 13, 2018, Keith Elkin ("Dean Elkin"), the Student Dean of Penn State Law wrote an email to Mr. Doe, asked Mr. Doe to relinquish the domain and return research materials to Professor Mathews. Mr. Doe was "required" to meet with Dean Elkin and Victor Romero ("Dean Romero"), Associate Dean for Academic Affairs.

46. On August 15, 2018, Mr. Doe met with Dean Romero and Dean Elkin, without an advisor, to return Professor Mathews' book.

47. In the meeting, Dean Elkin and Victor Romero asked Mr. Doe in addition to emails, whether Mr. Doe communicated with Defendant Mathews in other ways. Mr. Doe replied that he and Defendant Mathews had a video conference.

48. Dean Romero and Dean Elkin asked about the pen incident and shared that in their discussion with Professor Mathews, Professor Mathews stated he could not remember the incident.

49. Dean Romero and Dean Elkin asked whether Professor Mathews threatened to tarnish

Mr. Doe's reputation.

50. Dean Romero and Dean Elkin told Mr. Doe that he would not be allowed to take Professor Mathews' Administrative law class, as well as his other class. At law school, no other professor teaches administrative law.

51. Following Dean Romero and Dean Elkin's instruction, Mr. Doe relinquished the domain. Mr. Doe voluntarily provided additional paper documents to prove that he has finished the transaction. On August 16, 2018, Dean Romero confirmed Mr. Doe's compliance.

52. No charge was made against Mr. Doe, and no honor code violation was found.

### E. Mr. Doe met with Defendant Feldbaum for the first time, and Mr. Doe was assured that formal conduct was not made.

53. On August 15, 2018, Defendant Feldbaum wrote to Mr. Doe to "discuss the issuance of an administrative directive." Defendant Feldbaum assured "the directive is not considered formal conduct, however, if violated, could result in formal conduct."

54. On August 17, 2018, after Mr. Doe had a required meeting with Romero and Elkin, Mr. Doe had another meeting with Defendant Feldbaum. The meeting lasted 15 minutes.

55. Mr. Doe was not inquired regarding the recorded video in response to the "pen incisent," nor asked regarding Professor Mathews' plan to tarnish Mr. Doe's reputation.

56. Defendant Feldbaum did not explain why a no-contact directive was issued, and what allegations Defendant Mathews has made against Mr. Doe. Mr. Doe expressed Defendant Mathews should not contact him.

57. Mr. Doe was given a "notification of administrative directive." The reason why such a directive was issued was not disclosed in the letter. The letter was forwarded to Student File and University Police. Defendant Feldbaum signed the letter.

58. No charge was made against Mr. Doe, and no honor code violation was found.

## F. Defendant Feldbaum did not show up for the meeting that was supposed to hear Mr. Doe's "side of the story" and brought formal charges over the email, when the University was closed.

59. On February 8, 2019, Defendant Feldbaum sent Mr. Doe an email, stating "[t]here has been some information shared with me that is a bit concerning and I wanted to get your perspective." The meeting was scheduled for February 20, 2019.

60. On 5:32 AM, February 20, 2019, Mr. Doe wrote an email to Defendant Feldbaum that he will be at the student conduct office. University was closed due to heavy snow, and all university activity was suspended.

61. On 10:00 AM, February 20, 2019, Mr. Doe arrived at the student conduct office at the scheduled time. Defendant Feldbaum did not show up. On 9:48 AM, after claiming Mr. Doe refused to take Defendant Feldbaum's phone call, Defendant Feldbaum wrote she "received confirmation that another text message has been sent to Dr. Mathews from you." Defendant Feldbaum added "If you wish to get help with these issues and see if there is a way for you to continue in school, you need to acknowledge what you are doing and agree to get the assistance we will require. If you do not wish to acknowledge this, I will move forward with the conduct process today. Although I will not be able to meet with you in person, I can complete this process via e-mail. Or arrange for a phone call."

62. On 10:27 AM, Mr. Doe demanded what are the "confirmation" regarding Mr. Doe violated the directive. Four minutes later, Defendant Feldbaum replied "that is fine," adding she "ha[s] a series of text messages, one just sent today, which seems timely since you were scheduled to meet with me today." Defendant Feldbaum added, "I will issue the University charge and sanction to you for failure to comply, and you may contest the sanction and take the

case to a hearing."

63. In the emails forwarded by Defendant Feldbaum, Professor Mathews shared a screenshot, from which a text message was received on 9:12 AM of February 20, 2019. Twenty-two minutes later Professor Mathews captured the screenshot of the text message, on 9:34 AM of February 20, Professor Mathews wrote an email to Defendant Feldbaum, Dean Elkin and Dean Romero, stating "[j]ust received the attached text message. I would like to follow up as soon as is convenient."

64. Mr. Doe denied any association with these text messages and reiterated that Mr. Doe did not initiate any contact with Professor Mathews since the no contact directive was issued.

65. On 10:40 AM, Defendant Feldbaum wrote, "This is the information I will use to consider your charges. You may respond right now if you have more to say. If not, I will send you the charges."

66. On 10:50 AM, Defendant Feldbaum issued the University sanction based on Professor Mathews' assertion that he received one "anonymous" text and he believes it is from Mr. Doe. No other contact between Mr. Doe and Professor Mathews was alleged.

67. Mr. Doe received a "conference summary form," in which "as there was sufficient information to reasonably support a Code of Conduct violation, a sanction(s) has also been recommended."

68. Mr. Doe was charged with a code violation for "failure to comply with directive or condition," and additional sanction was a "counseling assessment" in which "counseling and psychological services will provide 1-session "initial consultation" for students referred by OSC to discuss their options for ongoing treatment as needed." And "conduct probation with transcript notation" which Mr. Doe's transcript will reflect this sanction until December 20, 2019.

69. According to the Penn State Code of Conduct & Student and Student Organization Conduct Procedures, Conduct probation is the sanction right below Conduct suspension and is the above Conduct conversation and Conduct warning. Also under the policy, Penn State states "Conduct probation may be recorded on a student's official University transcript when, either due to the serious nature of the offense or when a student's conduct history is significant, the Office of Student Conduct determines a notation is merited. "

70. On 4:53 PM, February 20, 2019, Defendant Feldbaum wrote, "I think you may have already decided to contest the charge. But you don't need to submit a decision until Monday. And you may want to speak with others about that decision." Under the university student information management system, and the law school academic mentor matching program, Dean Romero is Mr. Doe's advisor.

71. On 8:32 AM, February 28, 2019, Defendant Feldbaum wrote, "I also think you could find some support from CAPS(Counseling and Psychological Services). And if you do connect with them and it would be helpful, sign a release and then I can work with them also."

72. On March 4, 2019, Mr. Doe pointed out to Defendant Feldbaum that some of the screenshots provided by Defendant Feldbaum did not contain phone numbers, and requested to reproduce the screenshots.

73. Mr. Doe timely filed to contested the charge and requested a hearing.

74. On March 8, 2019, Defendant Feldbaum, in response to Mr. Doe's request to record the hearing, replied that "our procedures do not permit a recording of an [a]dministrative [h]earing." Defendant also stated Mr. Doe would not be assigned an adviser. On the same day, Defendant Feldbaum added that "this is an educational process, not a legal process. Our procedures are different."

75. The process of "administrative hearing" was not disclosed on the code of student conduct, and Mr. Doe had to ask specific questions regarding the process so that he can be aware of the process.

### G. Unsatisfied that Mr. Doe was found not have violated University Code nor the Law School Honor Code, Professor Mathews continued his attack on Mr. Doe. Mr. Doe was asked to meet with Academic dean and associate dean of the law school for the second time. No disciplinary charges were made against Mr. Doe, and no honor code violation was found.

76. On February 21, 2019, one day after Defendant Feldbaum charged Mr. Doe with a code violation sanction, Mary Beth Aber, Co-curricular Programs Coordinator of Student Service sent an email to Mr. Doe, writing: "Dean Elkin and Dean Romero have requested to meet with you Tomorrow, Friday, February 22, 2019."

77. On February 22, 2019, Dean Elkin and Dean Romero told Mr. Doe that Professor Mathews alleged that Mr. Doe misled Dean Romero and Dean Elkin, and provided a document produced on August 15, 2018.

78. Mr. Doe denied Professor Mathews' allegation that he misled both Dean, and demanded evidence.

79. Dean Romero and Dean Elkin are aware that Professor Mathews explicitly asked Mr. Doe to purchase the domain.

80. Dean Romero and Dean Elkin are aware that Mr. Doe is about to meet with Defendant Feldbaum because of some "texts."

81. No honor code violation was found, and no charges were made against Mr. Doe.

**H. Professor Mathews also falsely accused Mr. Doe to Defendant Feldbaum, and Mr. Doe contested the disciplinary sanction Defendant Feldbaum had issued. Mr. Doe met Defendant Feldbaum for the second time to contest the charge and the sanction. Professor Mathews appeared at the hearing to defend his assertion that the five text messages he received were from Mr. Doe.**

82. On March 4, 2019, Mr. Doe was given "Behavioral Threat Management Team Referral Form," Professor Mathews filed on August 10, 2018, at 12:07:30 pm, marked "nature" to be "unknown," "urgency" to be "unsure," "incident location" to be "University Park e-mail." In this 2590-word, 10-page document, the updated version of a report Professor Mathews posted on August 8, 2019 at 5:00 AM, Professor Mathews articulated in length that how "he was uncomfortable, but I didn't really know what to do about it" regarding Mr. Doe's appreciation of Professor Mathews' work. Professor Mathews mentioned CAPS (Counseling and Psychological service) 10 times in his report to describe Mr. Doe. Professor Mathews acknowledged the existence of a recorded video that he responded to the pen incident.

83. On March 4, 2019, Mr. Doe was given Professor Mathews' 1757-words, 8-page document titled "Statement to the hearing officer," dated on February 26, 2019. In this document, Professor Mathews "for reasons of timing, content, and context" analyzed "it is difficult to imagine these [five] text[s] coming from anyone other than [Doe]." Included was that date of one message was "the first anniversary of [Doe's] work for me as a research assistant," the date was close to when Mr. Doe was in a meeting with Dean Romero and Defendant Feldbaum, the text messages are similar to Mr. Doe's writing style that "sometimes hard to understand", his belief that a "sexual or amorous" tone existed between his communication with Mr. Doe." Finally, Professor Mathews also wrote he is "a low-drama person."

84. On 8:30 AM of March 12, 2019, Mr. Doe arrived at Student Conduct Office alone,

without an advisor. Mr. Doe asked Defendant Feldbaum whether she has printed Mr. Doe's

evidence, and found out Defendant Feldbaum printed only part of Mr. Doe's evidence and

exhibits he sent to Defendant Feldbaum.

85. After Mr. Doe pointed out Defendant Feldbaum did not print out some of Mr. Doe's

documents and exhibits, Defendant Feldbaum printed out the remaining document.

86. Defendant Feldbaum asked Mr. Doe whether Mr. Doe would be comfortable sitting in

the waiting area with Professor Mathews. Mr. Doe stated he wouldn't, and was guided to

Defendant Feldbaum's office to wait for the hearing.

87. Francesco Costanzo ("Dr. Castanzo") appeared in the hearing with Defendant

Feldbaum.

88. In the meeting, Defendant Feldbaum and Dr. Castanzo used Professor Mathews'

statement to question Mr. Doe. Mr. Doe's statement was not used in the meeting.

89. Mr. Doe was explaind regarding the domain transaction that Mr. Doe always agreed

to give the domain to Professor for free, and for some unknown reason Professor Mathews

refused. Both Defendant Feldbaum and the other office fully understood and nodded. No

question was being asked regarding Mr. Doe's explanation.

90. Mr. Doe explained his statement to the hearing officer, including the phone numbers

in the screenshot belongs to several living people, and such information can easily be discovered

using google search. One phone number belongs to a business. Therefore, unlike what Professor

Mathews asserts that they are "anonymous." In addition, Mr. Doe pointed out the phone numbers

have similar or identical area code as Professor Mathews' phone number, Professor Mathews'

phone number is public. Finally, Mr. Doe pointed out Professor Mathews even responded to one

phone number, stating that the number belongs to a colleague, indicating that these numbers are

not anonymous but are merely phone numbers that Professor Mathews didn't recognize.

91. After Mr. Doe's presentation, Professor Mathews started his presentation. He stated

that he never received any junk messages in his life, said he never asked Mr. Doe to purchase a

domain, which was in stark contrast with his statement in "Behavioral Threat Management Team

Referral Form."

92. After Professor Mathews finished his presentation, Professor Mathews asked

Defendant Feldbaum out before the hearing was adjourned. The room was left with Mr. Doe and

Dr. Castanzo for 15 minutes. After Defendant Feldbaum returned, Mr. Doe reiterated that he had

no problem with any other faculty whatsoever, and he had started working for another professor.

**I. Right after Mr. Doe's disciplinary contest hearing, Defendant Feldbaum pressured Mr. Doe to allow Professor Mathews to use Mr. Doe's contribution in Professor Mathews' book.**

93. Immediately after the hearing was adjourned, Defendant Feldbaum asked Mr. Doe to

come to her office and pressured Mr. Doe to allow being acknowledged in Mathews' book, and

allow Professor Mathews to use his contribution.

94. Defendant Feldbaum stated to Mr. Doe that an acknowledgment is like thanking your

parent in front of a book, showed Mr. Joe a book had a page reads "thanks to mom," pressured

Mr. Joe to agree to be acknowledged in Professor Mathews' book before the finding of the

hearing was revealed.

95. Mr. Doe stated his concern regarding such practice, stated "thanking parents" is

fundamentally different from thanking one of the research assistants who has contributed to the

book. Mr. Doe also stated a lot of laws that he researched has updated, which requires him

updating some of his research findings. Defendant Feldbaum strongly disagreed with Mr. Doe,

stated Mr. Doe was making a simple matter complicated.

**J. Four hours after the disciplinary hearing, Mr. Doe received an email titled outcome of the case, in which new speculation regarding Professor Mathews' text was made, and Mr. Doe was found responsible of violating the administrative directive.**

96. On 3:47 PM, March 12, 2019, Defendant Feldbaum wrote Mr. Doe that Defendant received a report from Dr. Castanzo, who is the supposed administrative hearing officer. Defendant wrote, "his sanction is conduct probation through Fall 2019 with concurrent counselling at CAPS(Counseling and Psychological Services)." (Defendant Feldbaum's typo was not corrected.)

97. Titled "2019-03-12-AdministrativeHearingReport," under rationale for Mr. Doe's violation of directive, the officer wrote Mr. Doe engaged in a practice called "Called ID Spoofing," in which the officer wrote such deception "is readily available to anyone who has a minimum computer/smart-phone savvy." Based on Mr. Doe's mere assertion that these number belongs to a list of people, the officer concluded: "Mr. Doe's credibility is questionable."

98. "Called ID Spoofing" was not mentioned in the hearing.

99. Under the document's file property, the report has a revision number of "2".

100.   This report, containing 1041 words, was created twenty-five minutes before Defendant Feldbaum wrote the email.

101.   The document was created by Dr. Costanzo but was modified by "Karen Feldbaum."

**K. Mr. Doe expressed he can't accept responsibility for something that he didn't do and demanded evidence for the newest speculation that Mr. Doe fraudulently used multiple people's phone number to send texts to Professor Mathews. As a retaliatory act, Defendant Feldbaum told Mr. Doe she obtained Mr. Doe's protected health information by spoke with Counseling and Psychological service of Penn State.**

102.    On March 12, 2019, at 4:27 PM, Mr. Doe expressed his disagreement with the outcome and the explanation for the sanction. On 10:00 PM, Defendant Feldbaum wrote, "it is import to note that this [is] one of our lowest sanction that may be assigned. And since you are already meeting with CAPS(Counseling and Psychological Service), it was intended to support what you are doing already." In addition, Defendant Feldbaum also stated "there is no notation on a transcript, nor does this sanction impact your student status," "I still understand you are upset," "I would be happy to meet with you."

103.    On March 14, 2019, at 3:35 PM, Defendant wrote: "I spoke with CAPS(Counseling and Psychological Services) this morning and they are willing to continue to meet with you on a regular basis."

**L. One day after Professor Mathews appeared on Mr. Doe's disciplinary hearing, Professor Mathews, via Defendant Feldbaum asked to acknowledge Mr. Doe in his next book, admitted that he omitted Mr. Doe's acknowledgment from his casebook, and to be allowed to use Mr. Doe's research contribution. Mr. Doe requested that the entire matter to be disclosed in his book or delete any part that Mr. Doe has contributed and remove Mr. Doe's acknowledgment. No response was provided. In the published book, Professor Mathews did not acknowledge Mr. Doe's, yet still used Mr. Doe's research.**

104.    On March 13, 2019, Defendant Feldbaum forwarded part of Professor Mathews' email, with title and some portion omitted. Professor Mathews' wrote Mr. Doe "will have to

decide whether or not he wants to be acknowledged based on these materials. Either way, it's

fine with me." In addition, regarding his already in use Administrative Law casebook, Professor

Mathews' wrote "there is no acknowledgments page" because he can't add a page on the online

casebook platform, Professor Mathews admitted he failed to acknowledge Mr. Doe's name in the

Administrative Law casebook that is already in use.

105.    On the same email, Professor Mathews attached an acknowledgment page and

table of contents of his book with the email, which was forward by Defendant Feldbaum. In the

mock acknowledgment page, Mr. Doe's name was present.

106.    Mr. Doe's contribution to his book was mainly researching Asian language

materials. In addition, because of Defendant Mathews' limited German skills and the existence

of extensive German legal issue analysis in Asian countries, Mr. Doe also assisted in finding

some Asian scholar's analysis of German legal issues.

107.    Mr. Doe replied that since almost one year has passed since he submitted his

research memo, he had to update the law. Defendant Feldbaum forwarded Mr. Doe's email to

Professor Mathews.

108.    No response was provided to Mr. Doe regarding Professr Mathews' dishonest

academic practice.

109.    Professor Mathews' book "Proportionality Balancing and Constitutional

Governance: A Comparative and Global Approach," co-authored by Alec Stone Sweet was be

published by Oxford University Press in 2019.

110.    In the published book, Mr. Doe's name was omitted from the acknowledgment,

but Mr. Doe's contribution was included in the book.

111.    Professor Mathews' casebook on Administrative Law was published on

chartacourse.com, an online casebook platform, and was used by students in his classroom in Spring 2019 semester. Students' are paying thirty dollars to gain access to the casebook.

**M. In addition to attacking Mr. Doe in front of University Students' affairs officer and Law School academic dean, student dean, Professor Mathews attacked Mr. Doe's in his classroom, and to Mr. Doe's future employer for an entire year.**

112.   Professor sent negative references to Mr. Doe's future employees, including the Professor who hired Mr. Doe afterward around August 2018.

113.   The Professor who hired Mr. Doe told Mr. Doe that "Professor Mathews told me Mr. Doe was the worst student, absolutely terrible."

114.   During Fall 2018 semester and Spring 2019 semester, Professor Mathews spoke negativity about Mr. Doe in his civil procedure and administrative law class in front of other law students multiple times. The entire matter was recorded using Penn State Law's recording system.

**N. Penn State enabled Defendant Feldbaum and Professor Mathews' behavior.**

115.   On March 14, 2019, Defendant Feldbaum wrote, "I spoke with CAPS(Counseling and Psychological Services) this morning and they are willing to continue to meet with you on a regular basis. For you to complete this sanction, you would need to sign a release so that I can verify your participation. The deadline for you to share that this release is signed would be April 15th."

116.   Mr. Doe communicated with Defendant Feldbaum his intention to file a lawsuit, to which on March 14, 2019, Defendant Feldbaum replied: "Please note that it would be important for you to address any further comments related a legal process to the University's

General Counsel Office." On March 29, 2019, regarding Mr. Doe's appeal, Defendant Feldbaum

wrote, "I understand you may have filed out an appeal form online. There is no appeal to an

Administrative Hearing." [Defendant Feldbaum's typo was not corrected.]

117.    Defendant Feldbaum ceased to communicate with Mr. Doe since March 29.

118.    Mr. Doe wrote to Danny Shaha, who supervises Office of Student Conduct and

serves as Assistant Vice President, Student Rights & Responsibilities from Office of the Vice

President to seek additional assistance. To that, Mr. Shaha replied, "it is my understanding that

the conduct process is complete, and there are no further appeals."

119.    Professor Mathews' public bashing of Mr. Doe in his class is recorded using Penn

State Law's class recording system, which the University has full access.

120.    All of the communication between Defendant Feldbaum, Professor Mathews, and

Mr. Doe was under the university email system, which the University has full access to.

121.    After Professor Mathews sent negative references to fellow University professors,

spread negative rumors about Mr. Doe in his class, On January 11, 2019, he was promoted to

Associate Dean for Research and Partnerships at the law school. Professor Mathews served that

leadership position for one semester. His predecessor served the same leadership position for one

and a half year (three semesters).

122.    Professor Mathews, after he deliberately omitted acknowledging Mr. Doe and yet

used Mr. Doe's contribution in his book, was promoted to Professor of Law by the University,

effective July 1, 2019. [14]

---

[14] https://news.psu.edu/story/578561/2019/06/20/academics/penn-state-promotions-academic-rank-effective-july-1-2019

## CAUSES OF ACTION

### *Violation of the Fourteenth Amendment and 42 U.S.C. § 1983*

123.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

124.  Student disciplinary proceedings at state-funded universities must be conducted in conformity with the Due Process Clause of the Fourteenth Amendment. Goss v. Lopez, 419 U.S. 565 (1975).

125.  Defendant Feldbaum determined that Mr. Doe had violated the University Code in 19 minutes.

126.  The process of "administrative hearing" was not disclosed in the University Code of Student Conduct, and Defendant Feldbaum's explanation was arbitrary.

127.  Mr. Doe was accused of sending Professor Mathews five anonymous texts, but the main documents being used in the hearing was "Behavioral Threat Management Team Referral Form."

128.  Mr. Doe presented evidence that the five text messages that Professor Mathews alleged to have received were from an actual living person, Professor Mathews' phone number is public, and Professor replied to one of the senders as his colleagues. After the hearing, new groundless speculation not being discussed in the hearing regarding Mr. Doe was made, falsely accused Mr. Doe of committing fraud by manipulating caller ID.

129.  The final report, even though it was claimed to be sent from another hearing officer, was altered by Defendant Feldbaum, and was created twenty-five minutes before Mr. Doe was informed of the outcome of the case.

130.  Mr. Doe's appeal was not considered.

### *First Amendment Retaliation*

131.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

132.    Mr. Doe demanded an explanation for the counseling and psychological services sanction after Defendant Feldbaum repeatedly asked for Mr. Doe's release.

133.    In response to Mr. Doe's demand, Defendant Feldbaum wrote "I spoke with CAPS(Counseling and Psychological Services) this morning, and they are willing to continue to meet with you on a regular basis," violated University policy and invaded Mr. Doe's privacy.

### *Breach of Contract*

134.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

135.    Penn State deviated from its University Policy, a contract with every member of Penn State Community. Specifically, Penn State broke its AD53, Privacy Policy regarding students' protected health information. None of the procedure outlined in the privacy policy was followed by Defendant Feldbaum.

136.    Penn State deviated its Notice of Privacy Practices under Counseling and Psychological Services. Specifically, Mr. Doe's protected health information was disclosed without authorization, and Mr. Doe's right under the Notice of Privacy Practices was denied.

137.    Penn State charges students for Counseling and Psychological Services under Student Fee.

138.    Penn State deviated from the Code of Conduct and Student Organization Conduct Procedures. Specifically, the Code was interpreted by Defendant Feldbaum arbitrarily, and under the Code, Defendant Feldbaum is the final degerminator and reviewer for the code.

139.  Penn State ignored its Values of Integrity, Respect, Responsibility, Discovery, Excellence, and Community, by violating Mr. Doe's privacy, interfering with Mr. Doe's education, and using student conduct procedure to resolve personal vendetta from a Professor. In addition, the sole interpreter of student conduct at Penn State actively assisted academically dishonest practice.

### *Invasion of Privacy*

140.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

141.   Defendant Feldbaum, after failed to provide documents Mr. Doe requested, used her power as the highest officer at University Office of Student Conduct to "called" University Counseling service to access Mr. Doe's protected health information, wrote "I spoke with CAPS(Counseling and Psychological Services) this morning, and they are willing to continue to meet with you on a regular basis."

142.   Defendant Feldbaum is aware that the sanction will be reported to the bar association and Mr. Doe's future employer.

143.   Defendant Feldbaum later claimed the sanction was to "support what you are doing already."

### *Negligence*

144.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

145.   The university had access to all the communications (emails), as well as Professor Mathews' classroom rant regarding Mr. Doe, but failed to take any action.

146.   The university failed to provide a competent, unbiased officer to manage disputes.

147.   The University, along with Defendant Feldbaum, failed to properly investigate faculty member's claim against a student.

148.   The University, along with Defendant Feldbaum, failed to investigate inconsistencies among Professor Mathews' words.

149.   The University enabled Professor Mathews to use his position of power to use Defendant Feldbaum to pressure Mr. Doe to allow Professor Mathews' academic misconduct.

150.   The University, along with Defendant Feldbaum, covered up Professor Mathews' academic misconduct after Professor Mathews admitted, in writing, failing to acknowledge Mr. Doe's contribution in his casebook.

151.   The University allowed Defendant Feldbaum, co-chair of academic integrity force to enable Professor Mathews' academic misconduct of taking advantage of Mr. Doe's academic work.

152.   The University failed to provide and enforce adequate protection to the students when the student was facing disciplinary process.

153.   The University failed to monitor CAPS(Counseling and Psychological Services) by allowing Defendant Feldbaum to obtain Mr. Doe's protected health information, and impermissibly disclose Mr. Doe's protected health information.

154.   The University allowed Defendant Feldbaum, highest level officer at Penn State to use her position of power to retaliate against Mr. Doe.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff prays that the Court award the following relief:

     (i)    declare, for the foregoing reasons, that the Defendant violated Plaintiff's Fourteenth Amendment right to due process of law;

     (ii)    declare, for the foregoing reasons, that the Defendant retaliated against Plaintiff for Plaintiff's First Amendment exercise;

     (iii)   issue an injunction requiring that the Office of Student Conduct vacate the finding that Plaintiff was "responsible" for violating the Code of Conduct;

     (iv)    issue an injunction requiring that Penn State reinstate Plaintiff as a student in good standing at Penn State;

     (v)    issue an injunction requiring that the Office of Student Conduct expunge all aspects of Plaintiff's student disciplinary file pertaining to the allegations leveled against him by Complainant;

     (vi)    award to Plaintiff monetary damages, and cost of suit; and;

     (vii)   award such further relief as deemed necessary and just by this court.

August 15, 2019

                                     Respectfully submitted,

                                     *John Doe*

                                     John Doe

**FROM:**

Yong Cui

850 Toftrees Avenue

State college, PA  16803

UNITED STATES
POSTAL SERVICE
1000

RECEIVED
HARRISBURG, PA

AUG 19 2019

Per ___ma___
Deputy Clerk

**TO:**

U.S. District Courthouse

228 Walnut Street

P.O. Box 983

Harrisburg, PA  17101

**Utility Mailer**