### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE 1438,[1]

               Plaintiff,

    v.

THE PENNSYLVANIA STATE
UNIVERSITY, et al.,

               Defendants.

CIVIL ACTION NO. 4:19-CV-01438

(BRANN, J.)
(MEHALCHICK, M.J.)

### <u>REPORT AND RECOMMENDATION</u>

Plaintiff John Doe 1438 commenced this action on August 19, 2019, asserting federal and state causes of action concerning his time as a student at the Pennsylvania State University Dickinson School of Law in University Park (the "University"). (Doc. 1). In his second amended complaint, Doe seeks monetary damages, declaratory relief, and injunctive relief. (Doc. 91, at 33). Before the Court is a motion to dismiss filed on April 16, 2021, by Defendants The Pennsylvania State University ("PSU"), Unknown Staff of Counseling and Psychological Services at Penn State ("Unknown Staff"), Karen Feldbaum, and Francesco Costanzo (collectively "Defendants"). (Doc. 92).

For the following reasons, it is respectfully recommended that Defendants' motion to dismiss be **GRANTED**. (Doc. 92).

---

[1] The Court previously granted Doe's unopposed motion to proceed under pseudonym. (Doc. 46).

I.   **BACKGROUND AND PROCEDURAL HISTORY**

A.   PROCEDURAL HISTORY

Doe filed his original complaint on August 19, 2019, against Karen Feldbaum, PSU, and the Pennsylvania State University Board of Trustees. (Doc. 1). On September 16, 2019, Doe filed an amended complaint adding Defendants Feldbaum, Constanzo, Unknown Staff, Danny Shaha, and Benjamin Locke, and removing Defendant Pennsylvania State University Board of Trustees.[2] (Doc. 11). On October 3, 2019, Doe docketed a "proof of service" indicating that he had served Defendants by USPS certified mail on September 17 and 18, 2019. (Doc. 18). In response, Defendants filed a motion to clarify and enforce the waiver of service on October 4, 2019. (Doc. 19). On October 11, 2019, Doe filed a Rule 55 motion for entry of default. (Doc. 20). On October 22, 2019, the Court noted that Doe had not properly served Defendants and that Doe's motion for entry of default was premature and should be stricken. (Doc. 26, at 4-5).

On October 29, 2019, Doe filed a renewed motion for default and a motion for reconsideration.[3] (Doc. 30; Doc. 32). Defendants then filed a motion to dismiss on November 18, 2019. (Doc. 40). On July 2, 2020, Doe filed a motion for preliminary injunction and/or, emergency motion for temporary restraining order along with a motion for pretrial conference.[4] (Doc. 63; Doc. 64). On July 14, 2020, the undersigned recommended that Doe's motion for default judgment be denied, Defendants' motion to dismiss be granted, and denied

_____

[2] Defendants Shaha and Locke were terminated from this action on April 2, 2021, following the filing of Doe's second amended complaint. (Doc. 92).

[3] The Court denied Doe's motion for reconsideration on July 14, 2020. (Doc. 69).

[4] On July 15, 2020, Doe withdrew his motion for preliminary injunction and/or emergency temporary restraining order. (Doc. 73; Doc. 86).

Doe's motion for pretrial conference.[5] (Doc. 71; Doc. 72).

On August 11, 2020, Doe filed a motion to stay and/or, motion for extension of time, which the Court denied on August 20, 2020. (Doc. 74; Doc. 75). Doe filed two additional motions to stay on September 24, 2020, and October 26, 2020. (Doc. 77; Doc. 79). Additionally, Doe filed a motion for preliminary injunction on December 2, 2020, and an amended motion for preliminary injunction on December 23, 2020. (Doc. 83; Doc. 87). On March 22, 2021, the Court granted Doe's motion for extension of time and denied Doe's motions to stay. (Doc. 90). On May 4, 2021, the Court heard oral argument regarding Doe's motions for preliminary injunction at which Doe withdrew his motions for preliminary injunction. (Doc. 96; Doc 97).

Doe filed his second amended complaint ("amended complaint") on April 2, 2021, and Defendants filed a motion to dismiss on April 16, 2021. (Doc. 91; Doc. 92). The motion to dismiss has been fully briefed and is ripe for disposition. (Doc. 92; Doc. 102; Doc. 106; Doc. 107).

B.   DOE'S AMENDED COMPLAINT

The Court presumes the allegations in Doe's amended complaint to be true for purposes of recommending a disposition on Defendants' motion to dismiss. *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

### 1.   Doe's Relationship with Professor Mathews

Doe arrived in the United States in 2017 to begin law school at the University. (Doc. 91, at 4). Doe's civil procedure class professor was Professor Judkins Mathews ("Mathews").

---

[5] The Court adopted the undersigned's recommendation on September 11, 2020. (Doc. 76).

(Doc. 91, at 4). During his first-year spring semester of law school, Doe began "help[ing] Mathews' research . . . in exchange for Mathews' time." (Doc. 91, at 4). On April 22, 2018, at a party outside of law school, Doe approached Mathews with a proposal to create a website showcasing Mathews's work. (Doc. 91, at 4). Mathews agreed to the proposal if Doe could "get a good deal," and Doe used "some of his points redeemed from Lexis to purchase the domain" for the website (i.e., judmathews.com)." (Doc. 91, at 4). Matthews "was unhappy with the arrangement without stating the reason." (Doc. 91, at 4). Mathews refused Doe's offer to gift the domain to Mathews and instead offered to pay Doe through an online broker. (Doc. 91, at 5). Doe "pointed out that if [he] accept[ed] money, he would be violating federal law for purchasing a domain for the sole purpose of reselling, and violating contract with Lexis, for reselling points in exchange for money." (Doc. 91, at 5). Ultimately, Mathews agreed to "accept the domain as a gift, writing to [Doe], 'the situation is satisfactory.'" (Doc. 91, at 5).

On May 14, 2018, Doe became Mathews's research assistant, paid by PSU under Mathews's supervision and was hired for the entire summer of 2018. (Doc. 91, at 5). Doe edited two of Mathews's books during his time as a research assistant. (Doc. 91, at 5). Doe referred to Mathews "as a father figure," and gave him several gifts, including on Father's Day, which Matthews placed on his desk. (Doc. 91, at 5). Mathews was flattered by Doe's compliments and "offered to 'become [Doe's] protector' throughout [Doe's] law school career." (Doc. 91, at 5). Doe objected to some of Mathews's methods concerning source attribution and citations in his forthcoming publications. (Doc. 91, at 6-7). Doe repeatedly stated his "unwillingness to comply [with Mathews's suggested practices regarding incorrect citations] and asked for more time so [Doe] can work under his ethical standard," Mathews

"yelled he can't motivate [Doe] on this aspect and threw a pen at [Doe]." (Doc. 91, at 7).

Doe sought out counseling through CAPS "to manage the challenge imposed by Mathews . . . ." (Doc. 91, at 7). Doe explains that students are encouraged "to seek assistance from [CAPS]" and are "reassure[d] that meetings are private and held in confidence." (Doc. 91, at 20). Doe notes that licensed professional counselors, psychologists, and clinical services providers make up the CAPS staff. (Doc. 91, at 21). CAPS staff assured Doe that "the information will be strictly confidential and [then] advised him to stop working for Mathews." (Doc. 91, at 7). The same week, Doe wrote to Mathews stating that "he wanted to discuss 'Monday's pen incident.'" (Doc. 91, at 7). Mathews refused to address the issue through email and insisted that the two arrange a video conference, which Mathews initiated on July 12, 2018, noting that it would be recorded. (Doc. 91, at 7). During the video conference, Mathews "stated he didn't like [Doe's] tone and threatened [Doe] by stating that [he] will have a lot of say in [Doe's] future employers" and that Doe would not "want any gap in [his] resume." (Doc. 91, at 7). Doe felt threatened by Mathews's statements and continued to work for Mathews that summer believing that "the ethical issues could be resolved if [he] worked longer hours without getting paid." (Doc. 91, at 8).

Doe worked for Mathews until August 7, 2019, when "Mathews abruptly stated to [Doe] that he did not want to extend [their] relationship."[6] (Doc. 91, at 8). Matthews agreed that Doe could use Mathews's "nickname 'JUD' as the name of [Doe's] project." and in the same note asked Doe "to play piano on Thursday or Friday." (Doc. 91, at 8). Doe, "[s]ensing

_____

[6] Before the termination, Mathews had again changed his mind and asked Doe to sell him the domain; Doe "reiterated that such a practice makes him uncomfortable" and proposed to relinquish the domain, which proposal Mathews strongly opposed. (Doc. 91, at 8).

Mathews' change of mind," asked that Mathews "stop any interaction with [him], following advice from [CAPS], and if necessary, invite the student dean to intervene to resolve remaining issues." (Doc. 91, at 8). Doe "put up a mock website" to demonstrate his project "JUD," and when he informed Mathews about the website, Mathews did not reply. (Doc. 91, at 8). When classes commenced, Doe "began to work for another professor at another department." (Doc. 91, at 8).

On August 13, 2018, the University's Law School Student Dean Elkin emailed Doe requiring him to "delete the domain, unpublish the website, and return research materials to Mathews" to which Plaintiff complied. (Doc. 91, at 9). On August 15, 2018, Doe was informed that he could not enroll in Mathews's class. (Doc. 91, at 9).

### 2.  No-Contact Directive and Text Messages

Defendant Karen Feldbaum was Doe's student conduct process case manager. (Doc. 91, at 3). Doe met with Feldbaum on August 17, 2018, for 15 minutes to "discuss the issuance of an administrative directive" and provide proof that "judmathews.com" had been deleted and unpublished. (Doc. 91, at 9). Doe was warned that if he violated the administrative directive, he "may be subject to . . . sanctions including interim suspension, suspension, or expulsion . . ." which Doe contends would result in his deportation (Doc. 91, at 10). "No charge was made against [Doe], and no honor code violation was found." (Doc. 91, at 10).

Feldbaum called Doe "multiple times" asking if he "initiated any contact with Mathews" and Doe denied that he had contacted Mathews (Doc. 91, at 10). On February 20, 2019, Feldbaum had scheduled a meeting with Doe "to get [his] perspective" however, the University was closed "due to heavy snow, and all classes and activities were canceled." (Doc. 91, at 10). Although Doe arrived at the University for the scheduled meeting, Feldbaum did

not attend. (Doc. 91, at 10-11). According to Doe's allegations, the following exchanges took place over email on February 20th:

- 9:48 a.m. – Feldbaum wrote to Doe that she "received confirmation that another text message has been sent to Mathews from [Doe]" and "pressured [Doe] to admit the wrongdoing and 'get help.'" (Doc. 91, at 11).

- 10:27 a.m. – Doe demanded "the 'confirmation' that showed [Doe] violated the [no-contact] directive." (Doc. 91, at 11).

- 10:31 a.m. – Feldbaum replied, "that is fine," stating that she had a "series of text messages, one just sent today, which seems timely since you were scheduled to meet with me today." (Doc. 91, at 11). Doe "denied any association with these text messages and reiterated that [he] did not initiate any contact with Mathews since the no contact directive was issued." (Doc. 91, at 11).

- 10:50 a.m. – Feldbaum issued a "University sanction based on Mathews' assertion that he received one 'anonymous' text and he believes it was from [Doe]." (Doc. 91, at 12).

Doe received a code violation which resulted in a "conduct probation with transcript notation" and a counseling assessment. (Doc. 91, at 12). On February 20, 2019, Feldbaum "attempted to persuade [Doe] not to contest the charge and warned [Doe] that a harsher sanction might be issued," however Doe still contested the charge and requested a hearing. (Doc. 91, at 12). Feldbaum requested that Doe "sign a release regarding [his] counseling service" and denied Doe's request that his hearing be recorded. (Doc. 91, at 12-13).

### 3. Doe's Meeting with Law School Deans, Administrative Hearing, and Aftermath of Decision

On February 22, 2019, Doe met with Dean Elkin and Academic Affairs Associate Dean Romero and was informed that Mathews had told them Doe had failed to delete the "judmathews.com" domain and website. (Doc. 91, at 13). Doe denied the allegation and was not charged with an honor code violation. (Doc. 91, at 13).

On March 4, 2019, Doe received a document stating that Mathews's perceived threat

of Doe's publishing of the website and the anonymous text messages that he believed were from Doe were the grounds for the non-contact directive. (Doc. 91, at 13). Doe's hearing took place on March 12, 2019. (Doc. 91, at 14). At the hearing, Doe and Mathews both proceeded to testify under oath, however only Doe "was warned [that] the consequences of [him] telling [a] lie [would] result in additional charges." (Doc. 91, at 14). The hearing was centered around inquiries regarding the "domain transaction." (Doc. 91, at 14). After Mathews finished giving his statements, he asked Feldbaum outside of the hearing room, where Doe and Administrative Hearing Officer Costanzo remained until Mathews and Feldbaum reemerged 15 minutes later. (Doc. 91, at 15).

Directly after the hearing, Feldbaum asked Doe to her office to pressure him to permit Mathews to acknowledge Doe and use Doe's contributions in his book. (Doc. 91, at 15). Feldbaum showed Doe another book wherein the author acknowledged, "thanks to mom," apparently in an attempt to sway Doe to permit Mathews to acknowledge him. (Doc. 91, 15). Doe voiced his concern that "thanking parents is different from thanking one of the research assistants who contributed to the book." (Doc. 91, at 16). Doe also noted that he would need to update some of his research findings to ensure their accuracy. (Doc. 91, at 16). Feldbaum "strongly disagreed" and told Doe that he "was making a simple matter complicated." (Doc. 91, at 16).

On March 13, 2019, Feldbaum attempted to make Doe choose between allowing Mathews to plagiarize Doe's work "or waiving [his] right." (Doc. 91, at 16). Additionally, Doe received a draft of a potential acknowledgement page including Doe's name. (Doc. 91, at 16). However, Doe stressed that he would like to update the law, have an explanation be included with his previous research, or have his contribution and acknowledgement removed.

(Doc. 91, at 16).

Four hours after his disciplinary hearing, at about 3:47 p.m., Feldbaum indicated that Doe's sanction is "conduct probation through Fall 2019 with concurrent counselling." (Doc. 91, at 17). Doe was accused of "Called ID Spoofing," a method of deception wherein a person impersonates an individual. (Doc. 91, at 17). Doe later informed Feldbaum that he intended to file a lawsuit to which Feldbaum responded by giving Doe the University General Counsel Office's information. (Doc. 91, at 17).

On March 14, 2019, Feldbaum informed Doe that she had spoken with CAPS and that they were willing to meet with him on a regular basis and that he "would need to sign a release so that [she] could verify [his] participation" in order to complete the sanction. (Doc. 91, at 18). Doe appealed the decision on March 19, 2019; however Feldbaum informed Doe that there is no appeal on March 29, 2019. (Doc. 91, at 18). Feldbaum thereafter ceased communicating with Doe. (Doc. 91, at 18).

Throughout the Fall 2018 and Spring 2019 semesters, Mathews spoke negatively about Doe in his classes. (Doc. 91, at 18). Additionally, Mathews failed to include an acknowledgement of Doe in his proportionality book or administrative law book but included Doe's contribution in the book. (Doc. 91, at 18-19). Doe claims that Mathews "sent negative references to Doe's future employees, including" another professor at the University. (Doc. 91, at 19). Finally, Doe contends that Mathews's accusations stalled the bar committee's distribution of his license because his character and fitness investigations are still ongoing. (Doc. 91, at 19).

### 4. The Academic Integrity Task Force Final Report and Recommendations

Against the background of these allegations, Doe asserts that Feldbaum undertook a

campaign of discrimination against international students. (Doc. 91, at 19-20). Doe asserts that Feldbaum was involved in a task force that advocated for "bigoted views toward students based on country of origin." (Doc. 91, at 19-20). The University's Faculty Senate ("Faculty Senate") renounced Feldbaum's finding, noting that her opinion demonstrated "bias toward international students" and removed her from the task force. (Doc. 91, at 20). The Faculty Senate also "found [that] the current University discipline process caused some faculty to manipulate the process that led to 'improper adjudication and excessive punishment.'" (Doc. 91, at 20).

## II.   DISCUSSION

### A.   LEGAL STANDARDS

#### 1.   Motion to Dismiss

Rule 12(b)(6) authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements which make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff

must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions…'" *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1429-30 (3d Cir. 1997)). The court also need not assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. St. Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan*, 20 F.3d at 1261. This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

With the aforementioned standard in mind, a document filed *pro se* is "to be liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A *pro se* complaint, "however inartfully

pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). Nonetheless, *pro se* plaintiffs are still subject to the basis pleading requirements of Rule 8. *Rhett v. N.J. St. Super. Ct.*, 260 F. App'x 513, 515 (3d Cir. 2008). The Third Circuit has further instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview St. Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

### 2.   Section 1983

Doe asserts federal civil rights claims pursuant to 42 U.S.C. § 1983, which provides a private cause of action for violations of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To succeed on a § 1983 claim, a plaintiff must demonstrate that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

### B.   Federal Claims

Doe asserts four federal causes of action under 42 U.S.C. § 1983: (1) a First

Amendment retaliation claim against all Defendants; (2) a Fourteenth Amendment due process claim against Feldbaum and Costanzo; (3) a *Monell* claim against PSU; and (4) a conspiracy claim against Feldbaum, Costanzo, and Unknown Staff. (Doc. 91, at 22-26).

### 1.   First Count: First Amendment Retaliation Claim Against all Defendants

Doe's first count accuses Defendants of retaliating against him through a "no-contact" directive due to his creation of a website. (Doc. 91, at 22). Doe argues that Defendants' reasoning that the "no-contact" directive was based on the anonymous text messages sent to Mathews is a pretext for discrimination. (Doc. 91, at 22). Defendants allege that Doe has failed to demonstrate an exercise of his First Amendment rights as the creation of a website is not expressive conduct and that he has failed to allege any retaliatory conduct due to his creation of the website. (Doc. 102, at 42-44). In response, Doe argues that he did not use any concerning language in his website and that the creation of his website "judmathews.com" is speech and it is not symbolic. (Doc. 106, at 11-12).

To state a claim for retaliation under the First Amendment, Doe is required to allege that (1) he engaged in protected conduct, (2) Defendants retaliated with action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights," and (3) a causal link exists "between the exercise of his constitutional rights and the adverse action taken against him." *See Mack v. Yost*, 427 F. App'x 70, 72 (3d Cir. 2011) (internal quotation marks omitted) (quoting *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003)). An action amounts to retaliation if the conduct is "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006) (quotation marks and citation omitted).

Doe has not adequately plead the elements of a retaliation claim as he fails to allege

that he engaged in protected conduct. (Doc. 91, at 22). The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "'Speech' is not construed literally or even limited to the use of words. Constitutional protection is afforded not only to speaking and writing but also to some nonverbal acts of communication, *viz.,* 'expressive conduct' (or 'symbolic speech')." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002). In order to assess whether conduct is symbolic in nature, Courts look to "the nature of [the] activity, combined with the factual context and environment in which it was undertaken." *Spence v. Washington*, 418 U.S. 405, 409-10 (1974); *see also Tenafly*, 309 F.3d at 158; *Troster v. Pa. St. Dep't of Corr.*, 65 F.3d 1086, 1090 (3d Cir. 1995).

Doe claims that his "creation of a website on judmathews.com is his valid first amendment exercise." (Doc. 91, at 22). In assessing whether a domain name is protected by the First Amendment, courts look to "whether the domain nam[e is] communicative or appear[s] to identify the source of the communication." *Web-adviso v. Trump*, 927 F. Supp. 2d 32, 47 (E.D.N.Y. 2013) (citing *Name.Space, Inc. v. Network Solutions, Inc.*, 202 F.3d 573, 585-86 (2d Cir. 2000)). When domain names are "not part of a communicative message but instead [are a] source identifier," they are not awarded First Amendment protection. *See Jews For Jesus v. Brodsky*, 993 F. Supp. 282, 286 n.1 (D.N.J. 1998) (quoting *Planned Parenthood Fed'n of Am. v. Bucci*, No. 97–629, 1997 WL 133313, at *10 (S.D.N.Y. March 24, 1997) (finding use by defendant of plaintiff's service mark in domain name was not protected by First Amendment)). If a domain name "provide[s] no commentary or criticism of [a] Defendant or any other topic" it is likely not communicative in nature. *Web-adviso*, 927 F. Supp. 2d at 47-48.

Here, "judmathews.com" does not provide any "commentary or criticism" regarding Mathews, his work, or any other communicative message. *See Web-adviso*, 927 F. Supp. 2d at 47-48. The domain name simply acts as a straightforward identifier as to what the website may contain. *See Planned Parenthood*, 1997 WL 133313, at *10. Therefore, the creation of "judmathews.com" is not protected First Amendment conduct and cannot be used to assert a claim for First Amendment retaliation. *See Mack*, 427 F. App'x at 72. It is recommended that Doe's First Amendment retaliation claim be **DISMISSED**. (Doc. 91, at 22).

### 2. Second Count: Fourteenth Amendment Due Process Claim Against Costanzo and Feldman

In his second count, Doe asserts that "Defendants [Feldbaum and Costanzo] disregarded procedural protection under [the] Fourteenth Amendment" and that Defendant "Feldbaum desired to punish [Doe and] manipulated [Doe's] student conduct process."[7] (Doc. 91, at 23-24). Defendants argue that Doe fails to state a Fourteenth Amendment claim. (Doc. 102, at 31). Defendants state that Doe's claim should be dismissed due to his failure to plead a protected property interest. (Doc. 102, at 32-34). Next, Defendants contend that even if Doe has asserted a protected property interest, he has failed to demonstrate that PSU did not provide him with due process. (Doc. 102, at 35-39). Finally, Defendants state that Doe has not alleged that Defendant Feldbaum was biased and that such an allegation is not grounds for a due process violation. (Doc. 102, at 39-41). In response, Doe asserts that Defendants manipulated the student disciplinary proceeding infringing on his right to "undisturbed education (which is tied to his legal status in the United States) and his

---

[7] As a state-sponsored school, PSU is subject to due process constraints. *See Doe v. Pennsylvania State Univ.*, 336 F. Supp. 3d 441, 446-47 (M.D. Pa. 2018).

autonomy to seek psychological help." (Doc. 106, at 13). Additionally, Doe argues that he has presented evidence that Defendant Feldbaum is biased against him and that such bias prevented him from a fair student conduct hearing. (Doc. 106, at 16-17).

The due process clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. In order to allege a claim for due process under § 1983, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). In an educational context, "[p]rocedural due process requires school authorities to provide students facing *temporary suspensions* with 'rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.'" *Osei v. Temple U.*, 518 F. App'x 86, 88 (3d Cir. 2013) (emphasis added) (quoting *Goss v. Lopez*, 419 U.S. 565, 581 (1975)). Thus, students "facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing." *Goss*, 419 U.S. at 579. This requires notice of the charges, an explanation of the evidence against the student, and an opportunity for the student to present his or her side of the story. *Osei*, 518 F. App'x at 88. Such opportunities only require the university to provide the student with "the opportunity to characterize his conduct and put it in what he deems the proper context" when the sanction is minimal. *Goss*, 419 U.S. at 584. Nothing in *Goss* indicates that the same due process rights are afforded to sanctions other than suspension or expulsion. *See Goss*, 419 U.S. at 584 ("Longer suspensions[ exceeding at least 10 days] or expulsions . . . may require more formal

- 16 -

procedures.").

i.    Property Interest

It is doubtful that students who do not face suspension or expulsion have any claim of a protected due process interest under *Goss*. *See* 419 U.S. at 584. As one court has held, "[b]eing on probation or being denied certain school privileges does not . . . rise to the level of the deprivation of a right secured by the Constitution requiring judicial relief." *Sill v. Pennsylvania State Univ.*, 318 F. Supp. 608, 617 (M.D. Pa. 1970) ("*Sill 1*"), *aff'd*, 462 F.2d 463 (3d Cir. 1972) ("*Sill 2*"); *see also Satell v. Temple U.*, No. 17-CV-2774, 2017 WL 3158761, at *4 (E.D. Pa. July 25, 2017) (dismissing claim for failure to allege a "due process property interest" where plaintiff did not allege the University-defendant had "stopped him from continuing his education.").

Doe contends that his sanctions were "wrongfully extended to 'psychiatric sanction,'" that they "implicated [his] property and liberty interest" in that they will be released to the bar, and that he believed a violation would lead to his deportation. (Doc. 91, at 23). Doe attempts to assert an interest in his "autonomy to seek psychological help," his education and his admission to the bar.[8] (Doc. 91, at 23; Doc. 106, at 13). Defendants assert that "Doe makes no allegation whatsoever that any of the Defendants . . . removed Doe from his educational program or otherwise stopped him from taking full advantage of that program." (Doc. 102, at 47). The question of whether a property interest exist is determined by state law. *Satell,*

---

[8] In his brief in opposition, Doe states that he has an interest in "his autonomy to seek psychological help," although in his amended complaint he does not clearly express such an interest. (Doc. 106, at 13; Doc. 91, at 23).

2017 WL 3158761, at *4. Although Pennsylvania law states that "a graduate student has a property interest protected by procedural due process in the continuation of [his] course of study" an action by a university does not amount to a deprivation if the student does not allege that the university "stopped him from continuing his education." *See Satell*, 2017 WL 3158761, at *4.

Doe fails to allege that he suffered from an infringement upon his property and liberty interests due to the sanctions he received. Doe states that his sanction prohibiting him from taking certain classes, a psychiatric sanction, and a conduct probation sanction, "in totality" implicate his property and liberty interests. (Doc. 91, at 23). First, Doe alleges he was precluded from taking courses, which implicated a protected property interest. (Doc. 91, at 23). The Third Circuit has "strongly suggested that the right to *continued graduate education* is not protected by substantive due process." *Manning v. Temple U.*, 157 F. App'x 509, 514 (3d Cir. 2005) (emphasis added) Next, the "conduct probation sanction" and "psychiatric sanction" that Doe received do not implicate a protected due process interest. (Doc. 91, at 23). "[B]eing placed on probation or being denied certain school privileges" is insufficient to assert a deprivation of rights rising to the level of the Fourteenth Amendment. *See Sill*, 318 F. Supp. At 617. The disciplinary action that Doe endured did not prevent him from continuing with his legal education. Therefore, he has not alleged a protected property interest to which constitutional due process attaches. *See Sill 1*, 318 F. Supp. at 617; *Satell*, 2017 WL 3158761, at *4.

Additionally, Doe has failed to allege a deprivation of a protected due process interest in his admission to the bar. A property interest in a benefit arises when a person has "more than a unilateral expectation of [the interest]." *See Piecknick v. Com. of Pa.*, 36 F.3d 1250, 1256

(3d Cir. 1994). A property interest may arise regarding a professional license when an applicant has "fulfilled all prerequisites upon which a license is automatically conferred." *Mash v. Township of Haverford*, 2007 WL 2254417, at *9 (E.D. Pa. Aug. 3, 2007) (citing *Herz v. Degnan*, 648 F.2d 201, 201 (3d Cir. 1981) (finding a property interest in a license when such license was "entitled to automatic renewal upon completion of a form and payment of a fee")). However, an applicant does not have a property interest in the license to which he or she is applying when the applicant has not met the necessary qualifications to receive the license or when "the governing statue or regulation provides for discretion in the decision to grant the benefit." *See Mash*, 2007 WL 2254417, at *9; *see also Martin v. Pa. State Real Estate Comm'n*, 1985 WL 2783, at *2 (E.D. Pa. Sept. 18, 1985); *Anderson v. City of Phila.*, 845 F.2d 1216, 1221 (3d Cir. 1988).

To be admitted to the Pennsylvania Bar, an applicant must complete the bar examination and the Multistate Professional Responsibility Examination and obtain satisfactory scores. Pa.B.A.R. 203 Rule 203(b). Additionally, an applicant must not have any "prior conduct . . . which in the *opinion* of the Board indicates character and general qualifications (other than scholastic) incompatible with the standards expected to be observed by members of the bar of [Pennsylvania]." Pa.B.A.R. 203 Rule 203(b)(2) (emphasis added). Thus, admission to the bar is discretionary as the opinion of the board is considered in the distribution of a license. *See* Pa.B.A.R. 203 Rule 203(b)(2). As the Pennsylvania Bar Association has discretion in deciding whether to grant a legal license and Doe has not alleged that the conferral of his legal license is automatic, Doe fails to allege that he has a property interest in his legal license. (Doc. 91, at 23).

ii.   Due Process of Law

Even if Doe had presented facts sufficient to allege a deprivation of property, he has failed to allege that the "procedures available to him did not provide due process of law." *See Hill*, 455 F.3d at 233-34 (internal quotations omitted). Doe avers that "the appeal and recording of the process were denied" and that Defendants failed "to listen to [Doe's] evidence with an open mind." (Doc. 91, at 24). Although "[t]he requirements of due process frequently vary with the type of proceeding involved . . . . [t]he basic elements are notice and the opportunity to be heard by a fair and impartial tribunal legally constituted and having jurisdiction of the case." *See Sill 2*, 462 F.2d at 469. Doe was notified of the "no-contact" directive and notified that it was believed that he had violated the directive. (Doc. 91, at 9-12). Additionally, Doe was afforded an opportunity to present his counter arguments to the charges through a hearing. (Doc. 91, at 14-15). As such, the procedures resulting in Doe's sanctions were not in violation of his due process rights because he was given notice and was heard by a tribunal. *See Sill 2*, 462 F.2d at 469.

iii.   Defendant Feldbaum's Alleged Bias

Additionally, Doe's allegations that Feldbaum was biased against him because he is an international student are unsupported. Doe alleges that Defendant Feldbaum sought to punish Doe, manipulated the student conduct process, and presented potential bias against Doe. (Doc. 91, at 24). Doe contends that Defendant Feldbaum's substantial involvement and leadership role "in a task force that is prejudicial against the group of people [Doe] belonged gives inference to one of her possible biases against [Doe]." (Doc. 91, at 24). His allegations based merely on Defendant Feldbaum's involvement in an unrelated task force are unsubstantiated as Doe fails to demonstrate how Feldbaum's alleged bias would have affected

his student conduct proceedings. The nature of Defendant Feldbaum's alleged bias involves academic misconduct which is unrelated to Doe's charge of violating the no-contact directive after his employment with Mathews. (Doc. 91, at 19-20). Doe does not allege sufficient facts to give rise to a plausible claim of bias given the circumstances of the hearing.

Doe fails to allege a property or liberty interest that was violated under the due process clause as he was not suspended or expelled, received notice of his charges, and had an opportunity to present his case. (Doc. 91, at 9-15). Therefore, because Doe has not alleged the violation of a protected due process interest and has failed to plead facts establishing the violation of any due process afforded to him under the law, it is recommended that Doe's Fourteenth Amendment due process claim be **DISMISSED**. (Doc. 91, at 23-24).

### 3.   Third Count: *Monell* Claim Against PSU

Doe asserts a *Monell* policy claim against PSU claiming that Defendant Feldbaum's position "regarding international students gives the inference that [PSU] customarily treats students differently based on [their] country of origin." (Doc. 91, at 25). Additionally, Doe argues that Defendant Feldbaum's actions "giv[e] the inference that [PSU] unfairly sides with faculty members in a student discipline process and faculties are abusing the discipline process for improper purposes." (Doc. 91,at 25). Defendants contend that Doe has failed to allege an affirmative act by PSU. (Doc. 102, at 57).

A "defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) (internal citations and quotation marks omitted). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence.

- 21 -

Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). An allegation seeking to impose liability on a defendant based on supervisory status, without more, will not subject the official to § 1983 liability. *Padilla v. Beard*, No. CIV. 1:CV-06-0478, 2006 WL 1410079, at *3 (M.D. Pa. May 18, 2006); *Rode*, 845 F.2d at 1207.

In some instances, despite the requirement that an individual be personally involved to give rise to a § 1983 claim, a municipality or local government may be held liable when the execution of a policy or custom of such municipality or corporation "inflicts the injury" for which the plaintiff seeks redress. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *see Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003); *see also Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, [] local government units can be sued directly for damages and injunctive or declaratory relief."). *Monell* represents an exception to general the rule that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka*, 481 F.3d at 210 (citations and quotations omitted). In *Monell*, the Supreme Court held that liability can attach to a municipality or local government entity that executes a *policy* or *custom*, which in turn "inflicts the injury" for which the plaintiff seeks redress. *Monell*, 436 U.S. at 694; *see Natale*, 318 F.3d at 584. *Monell* has previously been applied in cases against PSU. *Yan v. Penn State Univ.*, No. 4:10-CV-212, 2012 WL 3201888, at *9 (M.D. Pa. Aug. 3, 2012), *aff'd*, 529 F. App'x 167 (3d Cir. 2013).

A plaintiff must allege a constitutional injury upon which to base a claim under *Monell*.

See *Buonadonna v. Se. Delco Sch. Dist.*, No. 14-02708, 2015 WL 894352, at *2-3 (E.D. Pa. Mar. 3, 2015) ("For liability to attach under § 1983, the municipality itself must cause the constitutional violation at issue."); *see Does v. Se. Delco Sch. Dist.*, 272 F. Supp. 3d 656, 674 (E.D. Pa. 2017) ("[T]he fatal flaw in Plaintiffs' . . . theory of *Monell* liability is that they have not shown that [the alleged] conduct, whatever it may have been, was the result of a policy or custom."). As Doe has failed to plead a constitutional violation, Doe's *Monell* claim necessarily falls short. (Doc. 91, at 25); *see supra*.

Additionally, Doe's attempt to allege that the existence of a policy or custom that caused his injuries is insufficient. To establish a policy, a plaintiff must show that "a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." *Natale*, 318 F.3d at 584 (internal quotation marks omitted) (brackets in original). To establish a custom, a plaintiff must allege "an act that has not been formally approved by an appropriate decisionmaker, but that is so widespread as to have the force of law." *Natale*, 318 F.3d at 584 (internal quotation marks omitted). Doe asserts that Defendant Feldbaum's actions "giv[e] the inference that [PSU] customarily treats student differently based on student's county of origin . . . [and] that [PSU] customarily unfairly sides with faculty members in a student discipline process and faculties are abusing the discipline process for improper purposes." (Doc. 91, at 25). Doe relies on an "inference" that PSU has implemented a policy without demonstrating any pattern of a policy or facts that demonstrate such policies exist. (Doc. 91, at 25). PSU "cannot be held liable under §1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Accordingly, Doe must assert that PSU conducted its "own illegal acts" and that such acts "caused [his] injury." *See Connick v. Thompson*, 563 U.S. 51, 60-61 (2011) (quotations omitted). Doe merely asserts that

the actions of a PSU employee provide an "inference" that PSU engages in differential treatment of students and unfairly sides with faculty members in disciplinary hearings. (Doc. 91, at 25). Doe does not provide any facts to allege that PSU undertook such actions.

As such, Doe fails to allege a violation of his constitutional rights and that PSU undertook any action that could have deprived him of those rights. Therefore, it is recommended that Doe's *Monell* claim be **DISMISSED**. (Doc. 91, at 25).

### 4. Fourth Count: Conspiracy Claim Against Feldbaum, Costanzo, and Unknown Staff

In his fourth count, Doe alleges that Defendants Feldbaum, Costanzo, and Unknown Staff denied Doe's "right to an unbiased tribunal," retaliated against Doe for publishing his website, and "wrongfully disclosed [and obtained Doe's] mental health records." (Doc. 91, at 26). Defendants argue that Doe has not adequately pled a claim alleging that Defendants Feldbaum, Costanzo, and Unknown Staff acted in concert to deprive him of a constitutional right. (Doc. 102, at 58).

To state a § 1983 conspiracy claim, a "plaintiff must allege '(1) an actual violation of a right protected under § 1983 and (2) actions taken in concert by the defendants with the specific intent to violate the aforementioned right.'" *Campbell v. Balon*, No. 4:16-CV-00779, 2017 WL 2880856, at *13 (M.D. Pa. July 6, 2017) (quoting *Williams v. Fedor*, 69 F. Supp. 2d 649, 665 (M.D. Pa. 1999), *aff'd*, 211 F.3d 1263 (3d Cir. 2000)); *see also Marchese v. Umstead*, 110 F. Supp. 2d 361, 371 (E.D. Pa. 2000). "A plaintiff must make specific factual allegations of combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events." *Thomas v. City of Phila.*, No. 05-CV-4189, 2006 WL 8459466, at *1 n.3 (E.D. Pa. Apr. 11, 2006) (internal quotations omitted) (quoting *Panayotides v. Rabenold*, 35 F. Supp. 2d 411, 419 (E.D.Pa.1999), *aff'd*, 210

F.3d 358 (3d Cir. 2000)). The plaintiff cannot rely on "conclusory allegations of a conspiracy among defendants" and must instead plead a discernable factual basis for the alleged constitutional violations. *Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944, 949 (3d Cir. 2019) (dismissing conspiracy claim).

Here, Doe does adequately plead a violation of his rights under the First Amendment or Fourteenth Amendment. *See supra*. Absent "an actual violation of a constitutional right under [42 U.S.C. § 1983], [Doe's] conspiracy claim necessarily fails." *See Kovarik v. S. Annville Twp.*, No. 1:17-CV-00097, 2018 WL 1428293, at *10 (M.D. Pa. Mar. 22, 2018) (dismissing conspiracy claim after finding plaintiffs failed to state claims for retaliation and abuse of process); *see also Perano v. Twp. of Tilden*, 423 Fed. App'x 234, 239 (3d Cir. 2011) ("As a threshold matter, . . . a [42 U.S.C. §] 1983 conspiracy claim only arises when there has been an actual deprivation of a right."). As Doe's amended complaint only asserts constitutional claims under the First Amendment and Fourteenth Amendment, Doe has failed to allege "an actual violation of a right protected under § 1983," and his conspiracy claim fails. (Doc. 91, at 22-24, 25); *see Campbell*, 2017 WL 2880856, at *13. Accordingly, it is recommended that Doe's conspiracy claim be **DISMISSED**. (Doc. 91, at 26).

### 5. Remaining Arguments

Because Doe's complaint fails to state a claim for relief under Rule 12(b)(6), the Court declines to assess Defendants' remaining arguments, including those concerning immunity and allegations against individual Defendants in their official capacities. (Doc. 102, at 46-50). The Court nonetheless acknowledges that "[t]he Supreme Court has recognized that a suit against a state official in his or her official capacity is not a suit against the official but rather a suit against the individual's office." *Arnold v. New Jersey*, No. CIV.03-3997 WHW, 2007 WL

1381757, at *3 (D.N.J. May 9, 2007) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)) ("Therefore, suits against state officials in their official capacities are treated as suits against the state since the real party in interest is the state, not the named official."). Further, states and state-like entities, as well as state officials, under § 1983 are generally afforded Eleventh Amendment immunity in claims for money damages and non-monetary-relief to remedy past harms. *Kokinda*, 779 F. App'x at 948 ("The District Court properly concluded that Kokinda's claimed violations of §§ 1983, 1985(3), and 1986 against the DOC and the individual prison staff members sued in their official capacities are barred by the Eleventh Amendment."); *see Miller v. Rutgers*, 619 F. Supp. 1386, 1392 (D.N.J. 1985) ("[I]n holding that the Eleventh Amendment applies to Rutgers, I am in accord with the majority of federal courts which have considered the applicability of the amendment to state universities."); *see also Harris v. Zyskowski*, No. 12-CV-7191, 2016 WL 3566721, at *4 (D.N.J. June 30, 2016) ("Because the remaining claim of the Complaint does not seek prospective relief, and only seeks declaratory relief as to Defendant's *past actions*, the relief Plaintiff seeks is barred by the Eleventh Amendment." (emphasis added)).

C.  STATE CLAIMS

Doe asserts 10 state law causes of action for (1) breach of contract against PSU; (2) breach of fiduciary duty against Feldbaum and PSU; (3) invasion of privacy against Feldbaum; (4) breach of confidentiality against Feldbaum, Unknown Staff, and PSU; (5) false light against Feldbaum, Costanzo, and PSU; (6) defamation against Feldbaum, Costanzo, and PSU; (7) tortious interference against Feldbaum; (8) intentional (and/or negligent) misrepresentation against Feldbaum, Costanzo, and PSU; (9) civil conspiracy against Feldbaum Costanzo, and Unknown Staff; and (10) negligence against all Defendants. (Doc.

91, at 26-32). As the undersigned recommends that Doe's federal claims be dismissed, it is also recommended that the Court decline to exercise supplemental jurisdiction to hear Doe's state law claims. Where a district court has dismissed all claims over which it had original jurisdiction, it may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether a court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity . . . ." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state law claims remain, the balance of these factors indicates that the remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350. The Court finds nothing in the record to distinguish this case from the ordinary one, and thus the balance of factors "point toward declining to exercise jurisdiction over the remaining state law claims." *See Cohill*, 484 U.S. at 350 n.7.

### D.   LEAVE TO AMEND

The Third Circuit has instructed district courts to permit a curative amendment if a complaint is vulnerable to dismissal for failure to state a claim, unless an amendment would be inequitable or futile. *Grayson*, 293 F.3d at 108. Here, Doe has failed to assert a claim subject to federal jurisdiction. Additionally, given the facts of the case, the Court finds that amendment would be futile. *See Grayson*, 293 F.3d at 108. An attempt to amend a complaint is futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." *In re Burlington Coat Factory*, 114 F.3d at 1434 (*citing Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)). As Doe's First Amendment claim cannot proceed because his registration of a domain name is not an exercise of communicative speech, his

Fourteenth Amendment claim cannot proceed because his sanctions did not rise to the level of a constitutional violation and he was provided notice and an opportunity to defend himself, and his *Monell* claim and conspiracy claim cannot proceed because he has failed to allege a constitutional violation, Doe's claims fail as a matter of law. (Doc. 91, at 22-26). As such, amendment of Doe's amended complaint would be futile and it is recommended that he be denied leave to amend.

## III.   RECOMMENDATION

For the foregoing reasons, it is respectfully recommended that Defendants' motion to dismiss be **GRANTED**. (Doc. 92). Additionally, it is recommended that the Clerk of Court **CLOSE** this case.

BY THE COURT:

Dated: January 21, 2022                    s/ Karoline Mehalchick

**KAROLINE MEHALCHICK**
**Chief United States Magistrate Judge**

- 28 -

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

JOHN DOE 1438,

                Plaintiff,

   v.

THE PENNSYLVANIA STATE
UNIVERSITY, et al.,

                Defendants.

CIVIL ACTION NO. 4:19-CV-01438

(BRANN, J.)
(MEHALCHICK, M.J.)

### NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing **Report and Recommendation** dated **January 21, 2022**. Any party may obtain a review of the Report and Recommendation pursuant to Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof.  Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The briefing requirements set forth in Local Rule 72.2 shall apply.  A judge shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: January 21, 2022

*s/ Karoline Mehalchick*
**KAROLINE MEHALCHICK**
**Chief United States Magistrate Judge**