IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE 1438, | No. 4:19-CV-01438 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| THE PENNSYLVANIA STATE UNIVERSITY, *et al.*, | |
| Defendants. | |

MEMORANDUM OPINION

SEPTEMBER 30, 2022

Plaintiff John Doe 1438 passed the Pennsylvania bar exam but has not yet been permitted to practice law—the bar examiners are seemingly concerned about and focused on the character and fitness inquiry, assessing a law school sanction Doe received the spring semester of his second year following inappropriate communications with a particular professor. The Pennsylvania State University issued an administrative directive prohibiting Doe from contacting or otherwise communicating with that professor, and then found that Doe violated that directive by messaging the professor from a digitally randomized phone number. Penn State placed Doe on probation and required him to receive counseling.

Doe then filed suit *pro se*, alleging, among other things, that the sanctions violated his rights secured by the First and Fourteenth Amendments. But the magistrate judge assigned to the case found that Doe did not plead the existence of

protected liberty or property interests or First Amendment conduct. This Court agreed and dismissed the case. Doe now asks the Court to reconsider. But after further review, the Court finds no obvious error and affirms the dismissal.

I.     **BACKGROUND**

    A.     **Factual History**

John Doe, a foreign national, came to the United States in 2017 to attend law school at Penn State.[1] That fall, he took a class on civil procedure taught by Professor Judkins Cooper Mathews.[2] During the spring semester, Doe assisted Professor Mathews with research for a book the Professor was preparing to publish.[3] Professor Mathews then hired Doe as his research assistant the following summer.[4]

But what started as a seemingly standard, professional relationship took a peculiar turn. First, Doe purchased the website domain "judmathews.com" using points redeemed from the legal database LexisNexis.[5] Doe alleges that he pitched the idea to Professor Mathews (who goes by the nickname "Jud") at a "party outside of law school," and that Professor Mathews gave his assent if Doe could "get a good deal."[6] But according to a letter Professor Mathews sent to Penn

---

[1] Doc. 91 ¶¶ 7, 11–12.
[2] Id. ¶ 13.
[3] Id. ¶¶ 14, 26.
[4] Id. ¶ 24.
[5] Id. ¶ 17.
[6] Id. ¶ 16.

State—which Doe attached as an exhibit to his Second Amended Complaint—the Professor was not interested in a personal web page.[7] Professor Mathews wrote that after Doe suggested "he could buy judmathews.com, because it would be easy for him to do given his background in web development," Professor Mathews "was adamant that [he] didn't want that," but Doe "disregarded [his] wishes and bought judmathews.com anyway."[8] Regardless, both agree that when he learned Doe purchased the domain, Professor Mathews reacted negatively and did not want Doe owning a web domain with his name.[9]

Second, Doe began referring to Professor Mathews as a father figure.[10] Indeed, Doe gave Professor Mathews a gift on Father's Day and apparently gifted him other items as well.[11] According to Doe, Professor Mathews did not object to the gifts or Doe's expressions of admiration.[12] Professor Mathews's letter to the University suggests otherwise.[13]

---

[7] Doc. 91-3, Ex. 3 (Aug. 10, 2018 J. Mathews's Behavioral Threat Management Team Referral) at 2.
[8] Id.
[9] See id.; Doc. 91 ¶ 18.
[10] Doc. 91 ¶ 25.
[11] Id. ¶¶ 28–29.
[12] Id. ¶ 30.
[13] See Doc. 91-3, Ex. 3 (Aug. 10, 2018 J. Mathews's Behavioral Threat Management Team Referral) at 2 ("The communication from [Doe] that made me the most uncomfortable came in a card that he gave me in late June; he wrote in the card 'You are like a dad to me' with 'like a' crossed out, and 'I am so lucky to have you in my life.' I opened the card outside of his present . . . [and] talked it over with my wife: it was obviously a heartfelt communication, but it was also unprofessional and made me uncomfortable. I thought about writing him an e-mail about this, but my wife thought that might be harsh. Eventually, I brought it up in the video-conference conversation we had in July, as an example of something that crosses the boundary of a professional relationship.").

The professional relationship ultimately broke down in August 2018.[14] According to Doe, this rupture followed a confrontation over legal citations in Professor Mathews's impending book: Professor Mathews supposedly instructed Doe to falsify the citations for certain foreign language materials, but Doe refused.[15] In his letter, Professor Mathews offers an alternative explanation.[16] Specifically, Professor Mathews claims that Doe developed an "unhealthy obsession" with him, and when he attempted to "set or enforce boundaries," Doe lashed out over email.[17] Although Professor Mathews met with Doe to address these issues and believed they reached an amicable resolution, it wasn't long before the emails resumed—including a particularly "hostile and wildly accusatory" email sent one morning at 5:00 a.m.[18]

Doe neither admits nor denies these allegations.[19] But on August 13, the Student Dean of Penn State Law emailed Doe, demanding that he delete the website domain "judmathews.com" and return all research materials to Professor Mathews.[20] Four days later, Penn State issued an administrative directive

---

[14] Doc. 91 ¶ 46.
[15] *Id* ¶¶ 31–35.
[16] Doc. 91-3, Ex. 3 (Aug. 10, 2018 J. Mathews's Behavioral Threat Management Team Referral) at 3–4.
[17] *Id*. at 3.
[18] *Id*. at 4.
[19] Doe makes no mention of Mathews's allegations in his Second Amended Complaint, but, again, he attached as an exhibit to his Second Amended Complaint Professor Mathews's letter to Penn State detailing these events. *See* Doc. 91-3, Ex. 3 (Aug. 10, 2018 J. Mathews's Behavioral Threat Management Team Referral).
[20] Doc. 91 ¶ 50.

prohibiting Doe from contacting Professor Mathews—the so-called "no-contact" directive.[21]

In February 2019, Professor Mathews received text messages—some threatening, some adoring—from unfamiliar phone numbers; he believed the messages were actually sent by Doe.[22] Penn State investigated to determine whether Doe, in fact, authored the messages, as that would constitute a violation of the no-contact directive.[23] The University held an administrative hearing on the matter on March 12, 2019, and although Doe denied (and still denies) that he sent the messages, Penn State concluded that he did.[24] After noting that "a caller ID can be easily misrepresented" (citing an online resource known as "Called ID Spoofing," which is "readily available to anyone who has a minimum computer/smart-phone savvy") and determining that Doe's "credibility is questionable," the University's Administrative Hearing Officer found "it is more probable than not that [Doe] is the author of the text messages that Dr. Mathews has received in February of this year."[25] Accordingly, Penn State found that Doe violated the no-contact directive and ordered the following sanctions and

---

[21] *See* Doc. 91-4, Ex. 4 (Aug. 17, 2018 Administrative Directive).
[22] *See* Doc. 91-7, Ex. 7 (Feb. 26, 2019 J. Mathews Statement to the Hearing Officer) (examples include the following: "I am yours and no one can take you away from me"; "I am showing how much I love you by sucking it all up. I know you are hot, so you don't need to know everything or do everything. I am doing this for you, and it's difficult"; "I will keep my promise to you because you are my love daddy"; "I love you").
[23] *See* Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report).
[24] *Id.*; *see also* Doc. 91 ¶¶ 82–97.
[25] Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report) at 2–3.

5

conditions: "Conduct Probation through the end of the Fall 2019 Semester, with concurrent counseling through CAPS [i.e., the University's student counseling service]."[26]

Although the Second Amended Complaint is silent as to Doe's current academic status, it appears that he completed his studies and graduated without incident. Doe passed the Pennsylvania bar exam, though investigations into his character and fitness for admittance to the Pennsylvania Bar remain ongoing.[27]

B.  **Procedural History**

Doe initiated this lawsuit on August 18, 2019.[28] He amended his complaint twice, filing the operative Second Amended Complaint on April 2, 2021.[29] The Defendants, which include Penn State and various University officials, moved to dismiss the Second Amended Complaint for failure to state a claim.[30] On January 21, 2022, the magistrate judge assigned the matter, Chief Magistrate Judge Karoline Mehalchick, issued her report and recommendation, recommending that this Court grant the Defendants' motion to dismiss and close the case.[31] The Court concurred with Judge Mehalchick's assessment of the matter, adopted her report, and dismissed the Second Amended Complaint with prejudice.[32]

---

[26] *Id.* at 1, 3.
[27] Doc. 91 ¶ 123.
[28] Doc. 1.
[29] Doc. 91.
[30] Doc. 92.
[31] Doc. 108.
[32] Doc. 111.

On March 24, 2022, Doe filed a motion for reconsideration.[33] That motion has been fully briefed and is not ripe for disposition.[34]

## II. LAW

To properly support a motion for reconsideration, a movant must demonstrate "at least one of the following: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."[35] As to the third ground, in reviewing for clear error, reconsideration is warranted only if the "court is left with the definite and firm conviction that a mistake has been committed."[36] Mere disagreement with the earlier ruling is insufficient.[37]

## III. ANALYSIS

In his motion for reconsideration, Doe argues that the Court must reverse its adoption of Chief Magistrate Judge Mehalchick's January 2022 Report and Recommendation "to avoid injustice."[38] Put differently, Doe believes that by

---

[33] Doc. 112.
[34] *See id.*; Doc. 113; Doc. 114.
[35] *In re Vehicle Carrier Services Antitrust Litig.*, 846 F.3d 71, 87 (3d Cir. 2017) (ellipsis and internal quotation marks omitted).
[36] *Prusky v. ReliaStar Life Insurance Co.*, 532 F.3d 252, 258 (3d Cir. 2008) (internal quotation marks omitted).
[37] *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 312 (3d Cir. 2018) (holding that for clear error, a movant "must show more than mere disagreement with the earlier ruling; it must show that the [court] committed a direct, obvious, or observable error" that is "of at least some importance to the larger proceedings") (internal quotation marks, citation, and brackets omitted).
[38] Doc. 112 at 2.

accepting Judge Mehalchick's reasoning and therefore granting the Defendants' motion to dismiss the Second Amended Complaint, the Court committed a direct, obvious error.[39] Doe highlights two findings he considers erroneous: (a) the failure to allege a protected interest that would trigger due process protections,[40] and (b) the absence of protected First Amendment conduct.[41] After reviewing the record, the Court again accepts these findings as there is no obvious error to justify an alternate ruling on reconsideration.

### A. Protected Property or Liberty Interest

In her January 2022 Report and Recommendation, Judge Mehalchick concluded that Doe fails to allege that the sanctions he received implicated a protected property or liberty interest.[42] Specifically, Judge Mehalchick noted that the "conduct probation sanction" and "psychiatric sanction" do not constitute "a deprivation of rights rising to the level of the Fourteenth Amendment," as neither prevented Doe from continuing with his legal education.[43]

Doe now asks the Court to reconsider this conclusion based on the "stigma-plus" theory, which the United States Court of Appeals for the Third Circuit propounded in *Hill v. Borough of Kutztown*.[44] There, the Third Circuit explained

---

[39] *See In re Energy Future Holdings Corp.*, 904 F.3d at 312.
[40] Doc. 112 at 5–10.
[41] *Id*. at 11–14.
[42] Doc. 108 at 18.
[43] *Id*. (citing *Sill v. Pennsylvania State Univ.*, 318 F. Supp. 608, 617 (M.D. Pa. 1970) (Nealon, J.), *aff'd*, 462 F.2d 463 (3d Cir. 1972); *Satell v. Temple Univ.*, 2017 WL 3158761, at *4 (E.D. Pa. July 25, 2017)).
[44] Doc. 112 at 5 (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 235–36 (3d Cir. 2006)).

8

that "an individual has a protectable interest in reputation," and although "reputation *alone* is not an interest protected by the Due Process Clause," a plaintiff can "make out a due process claim for deprivation of a liberty interest in reputation" by showing "a stigma to his reputation *plus* deprivation of some additional right or interest."[45] To satisfy the "stigma" prong of the test, the plaintiff must allege "that the purportedly stigmatizing statement(s) (1) were made publicly, and (2) were false."[46] For the "plus" prong, the alleged additional right or interest must be a "sufficiently tangible interest"; rights or interests considered "too ethereal" are insufficient to support a reputation-based due process claim.[47]

That said, the Third Circuit acknowledges the inherent difficulty in defining what, precisely, qualifies as a sufficiently "tangible interest," noting that this "has been the source of confusion."[48] As guidance, the Third Circuit has found the following injuries sufficiently tangible to satisfy the "plus" factor of the "stigma plus" requirement: deprivation of the liberty to pursue a calling or occupation; injury to the plaintiff's reputation while in the exercise of her constitutional right to free speech; a constructive discharge and consequent damage to the plaintiff's

---

[45] *Hill*, 455 F.3d at 235–36 (citations omitted).
[46] *Id* at 236 (internal citations omitted).
[47] *Good v. City of Sunbury*, 352 F. App'x 688, 691–92 (3d Cir. 2009).
[48] *Id*. at 691 (internal quotation marks omitted).

ability to earn a living; and an injury to a right created and defined by state statutory law.[49]

Conversely, the Third Circuit deemed "too ethereal"—and therefore "insufficient to support a reputation-based due process claim"—the possible loss of future employment opportunities, the temporary removal from customary duties, the denial of a promotion and transfer to a lesser position, and even outright financial harm.[50] And "emotion distress suffered attendant to reputational harm" likewise "does not constitute a valid 'plus' factor for purposes of the 'stigma plus' requirement."[51]

Here, Doe argues that the Defendants stigmatized him by labeling him "a criminal impersonating another person, and knowingly violating a University directive."[52] He believes this stigma was compounded by the sanction mandating "psychiatric treatment"—an imposition he considers the "'plus' on top of stigma."[53] But Doe is wrong on both fronts.

First, the Second Amended Complaint does not establish that the Defendants issued any improper stigmatizing statements. Doe does not allege, and the

---

[49] *Id*. at 691–92 (citing *Thomas v. Independence Township*, 463 F.3d 285, 297 (3d Cir. 2006); *Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 797 (3d Cir. 2000); *Dee v. Borough of Dunmore*, 549 F.3d 225, 234 (3d Cir. 2008); *Hill*, 455 F.3d at 232–33)).

[50] *Id*. at 692 (citing *Clark v. Township of Falls*, 890 F.2d 611, 620 (3d Cir. 1989); *Edwards v. California University of Pennsylvania*, 156 F.3d 488, 492 (3d Cir. 1998); *Robb v. City of Philadelphia*, 733 F.2d 286, 293 (3d Cir. 1984); *Sturm v. Clark*, 835 F.2d 1009, 1013 (3d Cir. 1987)).

[51] *Id*. at 691 (citing *Baraka v. McGreevey*, 481 F.3d 187, 208–09 (3d Cir. 2007)).

[52] Doc. 112 at 5.

[53] *Id*.

documentary evidence accompanying his Second Amended Complaint does not establish, that the Defendants labeled him a "criminal impersonating another person." In August 2018, Penn State issued an administrative directive prohibiting Doe from contacting Professor Matthews,[54] and in March 2019, following an administrative hearing, the University found that Doe violated the directive by sending text messages to Professor Matthews in February 2019.[55] Although Doe alleges that the administrative hearing report announcing the University's findings and sanctions contains "a brand new, false accusation that [Doe] criminally impersonated as individuals in New Jersey [and] New Haven, and a corporation in Mississippi,"[56] at no point in the report does Penn State describe Doe or his conduct as "criminal."[57] Indeed, the report notes that "Called ID Spoofing"—the service that Penn State believes Doe used to conceal his identity when texting Professor Matthews—"is readily available to anyone who has a minimum computer/smart-phone savvy."[58]

Accordingly, the only purportedly stigmatizing statement Doe cites concerns his "knowing[] violat[ion]" of "a University directive."[59] But even if the Court accepts that Penn State publicized this statement to the Pennsylvania Bar

---

[54] Doc. 91-4, Ex. 4 (Aug. 2018 Administrative Directive).
[55] Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report); *see also* Doc. 91 ¶¶ 82–97, 108–09.
[56] Doc. 91 ¶ 169.
[57] *See id.*
[58] Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report) at 2.
[59] Doc. 112 at 5.

11

Examiners,[60] it would not qualify as improperly stigmatizing because the statement would be true.[61] As discussed, Penn State concluded that Doe violated the August 2018 no-contact directive by authoring the text messages Professor Matthews received in February 2019.[62] To be clear, Doe disputes this finding.[63] For purposes of the "stigma-plus" theory, however, that is neither here nor there. Because Penn State held a hearing on Doe's conduct and concluded that he violated a University directive, any statement to that effect would be true, defeating Doe's claim of stigma.

---

[60] In the Second Amended Complaint, Doe pleads only that "the resulting sanction will be released to [Doe's] applied bar committee," Doc. 91 ¶ 144(d); he provides no indication of whether Penn State, in fact, informed any bar examiners of this sanction. More importantly, he does not allege what, precisely, Penn State stated in this prospective disclosure. In fairness, Doe attaches to his reply brief in support of the motion for reconsideration an affidavit describing a letter from the Pennsylvania Bar Examiners detailing concerns about "interactions and the relationship history between [Doe] and one of the law school professors, Dr. Matthews." Doc. 114-1 (Apr. 21, 2022 J. Doe Affidavit) ¶ 4. According to Doe, the letter from the Bar Examiners indicates that Penn State accused Doe of "lying to a fact finder and presenting false evidence," and claimed that Doe's "behavior caused him to receive a directive to not have contact with Professor Matthews." *Id.* ¶ 5. But because Doe does not attach the letter, the Court has no means of determining the accuracy of these quotes. Regardless, these statements are of no consequence to the instant motion. As Doe helpfully reminds the Court, it is "still entertaining a 12(b)(6) motion." Doc. 114 at 10. Therefore, the Court is limited to the facts alleged in the Second Amended Complaint and the supporting documentation attached thereto, *see Buck v. Hampton Township School Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); facts outside the Second Amended Complaint—including those first introduced in the parties' briefing papers—"are not properly considered at this stage." *Schlegel v. State Farm Mutual Automotive Insurance Co.*, 2012 WL 2885052, at *3 n.1 (M.D. Pa. July 13, 2012) (Caputo, J.).

[61] *See Hill*, 455 F.3d at 236 (holding that the plaintiff must allege "that the purportedly stigmatizing statement(s) . . . were false").

[62] *See* Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report).

[63] *See* Doc. 91 ¶ 70 ("Plaintiff denied any association with 'text messages' and reiterated that Plaintiff did not initiated any contact with Matthews since the no contact directive was issued.").

12

Second, even if Doe could show stigma, the sanctions imposed—specifically, "counseling through CAPS"[64]—do not satisfy the "plus" prong of the "stigma-plus" theory. Trying to achieve maximum effect, Doe characterizes the counseling requirement as a "psychiatric sanction" and compares his plight to that of a child who experienced sexual assault.[65] These arguments are both egregious and unpersuasive. The Defendants do not dispute that, as part of the sanctions and conditions imposed following Penn State's finding that Doe violated the no-contact directive, the University required Doe to receive counseling.[66] They assert instead that this requirement does not implicate a right or interest sufficiently tangible to sustain a reputation-based due process claim.[67] The Court agrees.

Lost in Doe's argument is what the sanction actually entailed: after concluding that Doe violated the no-contact directive by sending multiple anonymous text messages to Professor Mathews, Penn State placed Doe on conduct probation through the end of the fall 2019 semester and ordered counseling through the University's counseling service, CAPS.[68] He was not expelled. He was not denied the ability to attend class or earn course credit. He was not prohibited from graduating. Instead, he was required to see a counselor. That was it. Doe does not cite, and the Court is not aware of, any legal authority

---

[64]   Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report) at 1.
[65]   Doc. 112 at 6–10.
[66]   *See* Doc. 113 at 15–18.
[67]   *Id.*
[68]   Doc. 91-9, Ex. 9 (Mar. 12, 2019 Administrative Hearing Report) at 1.

establishing that a school requiring a student to see a counselor constitutes the deprivation of a sufficiently tangible interest or right for purposes of a reputation-based due process claim.

Instead, Doe directs the Court to a series of cases involving sex offender therapy. For example, in *Renchenski v. Williams*, the Third Circuit held that "the stigmatizing effects of being labeled a sex offender, when coupled with mandatory behavioral modification therapy, triggers an independent liberty interest emanating from the Due Process Clause of the Fourteenth Amendment."[69] Similarly, the United States Court of Appeals for the Ninth Circuit held in *Neal v. Shimoda* that "the stigmatizing consequences of the attachment of the 'sex offender' label coupled with the subjection of the targeted inmate to a mandatory treatment program whose successful completion is a precondition for parole eligibility create the kind of deprivations of liberty that require procedural protections."[70]

But these cases are premised on the understanding that sex offender therapy is "qualitatively different" than other forms of counseling or treatment.[71] Indeed, in *Coleman v. Dretke* (which the Third Circuit in *Renchenski* favorably cites as a legal predicate supporting its ruling), the United States Court of Appeals for the Fifth Circuit differentiated sex offender therapy and other forms of counseling or treatment that parolees are required to participate in as a condition on their

---

[69]   622 F.3d 315, 328 (3d Cir. 2010).
[70]   131 F.3d 818, 830 (9th Cir. 1997).
[71]   *Renchenski*, 622 F.3d at 328 (citing *Coleman v. Dretke*, 395 F.3d 216, 223 (5th Cir. 2004)).

release.[72] The Fifth Circuit explained that because sex offender therapy involves "intrusive and behavior-modifying techniques," requiring a parolee to undergo sex offender therapy implicates a liberty interest.[73] Implicit in this reasoning is that more traditional forms of "counseling or treatment" do not.[74]

Because the Second Amended Complaint presents neither a stigmatizing statement nor the deprivation of a sufficiently tangible right or interest, Doe has not established that the sanctions imposed implicated a liberty interest under the "stigma-plus" theory. Therefore, Judge Mehalchick did not commit a "clear error of law" necessitating reversal on reconsideration to "prevent manifest injustice."[75]

### B.    Protected First Amendment Conduct

In adopting the January 2022 Report and Recommendation, the Court also concurred with Judge Mehalchick's finding that "Doe has not adequately pleaded the elements of a retaliation claim as he fails to allege that he engaged in protected conduct."[76] Judge Mehalchick focused on Doe's claim that his "creation of a website on judmathews.com is his valid first amendment exercise,"[77] and concluded that because the domain name "judmathews.com" does not "provide any 'commentary or criticism' regarding Mathews, his work, or any other

---

[72]   395 F.3d at 223.
[73]   *Id*.
[74]   *Id*.; *see also Neal*, 131 F.3d at 830 (noting that "treatment and behavioral modification programs" such as "anger management or alcohol abuse classes" have "long withstood legal challenge").
[75]   *In re Vehicle Carrier Services Antitrust Litig.*, 846 F.3d at 87.
[76]   Doc. 108 at 13–14 (cleaned up).
[77]   *Id*. at 14 (citing Doc. 91 ¶ 137).

15

communicative message," the "creation of [the webpage] is not protected First Amendment conduct and cannot be used to assert a claim for First Amendment Retaliation."[78]

Doe now decries Judge Mehalchick's reasoning as erroneous, asserting that she "came up with a strawman and concluded the issue was registration of the domain."[79] According to Doe, for First Amendment free speech purposes, the "publication of [a] website" is distinct from the "registration of [a] domain," and, as such, Judge Mehalchick erred by considering the latter rather than the former.[80] But, again, the Court finds Doe's protestations unpersuasive.

As a preliminary matter, Doe offers no legal basis for distinguishing the "publication of [a] website" and the "registration of [a] domain."[81] He cites no case law in which courts treat these as separate terms of art referring to distinct actions, and the Court is not aware of any. To be sure, publishing content on a website is indisputably distinct from registering a domain.[82] Here, however, there is no published content to speak of. Nowhere in the Second Amended Complaint does

---

[78] *Id*. at 15 (citations omitted).
[79] Doc. 112 at 11.
[80] *Id*.
[81] *Id*.
[82] *Compare Howell v. Millersville University of Pennsylvania*, 749 F. App'x 130, 135–36 (3d Cir. 2018) (analyzing First Amendment retaliation claim based on, among other things, "berating of a student . . . on a class Facebook page"), *with Web-adviso v. Trump*, 927 F. Supp. 2d 32, 47–48 (S.D.N.Y. 2013) (outlining legal standard for First Amendment claims based on domain names; holding that the domain names in question were "not communicative and Plaintiff's use of them is not protected by the First Amendment").

Doe explain what was displayed on "judmathews.com."[83] Indeed, based on Doe's pleadings and briefing, it's unclear whether *anything* was displayed on that webpage.[84]

Moreover, Judge Mehalchick appropriately predicated her reasoning on the language in the Second Amended Complaint. In the operative pleading, Doe alleges that his "creation of a website on judmathews.com is his valid first amendment exercise."[85] In the succeeding paragraph, Doe asserts that Penn State issued the no-contact directive because Professor Mathews "complained about [Doe's] publishment of website on judmathews.com."[86] But that does not alter or negate Doe's stated basis for the First Amendment claim: the creation of the website. It then fell to Judge Mehalchick to determine what, precisely, Doe meant by the "creation" of the website and whether this conduct fell within the parameters of the First Amendment.

To that end, Judge Mehalchick's focus on the registration of the domain was eminently reasonable. Doe alleges that Penn State "demanded [that he] take down the website and the compliance was verified by the University officials," and then held an administrative hearing on Professor Mathews's assertion about Doe's

---

[83] *See* Doc. 91 ¶¶ 11–53, 78–81, 137–43.
[84] *See* Doc. 112 at 11–13 (discussing whether "Plaintiff *might* post" defamatory material or whether the "feared" disclosure of Professor Mathews's purported abuse "*might* happen in the future") (emphasis added).
[85] Doc. 91 ¶ 137.
[86] *Id*. ¶ 138 (grammatical errors in original).

"continued ownership of judmathews.com."[87] These pleadings indicate that by registering the domain "judmathews.com," Doe created a webpage that was live and accessible—something can only be "take[n] down" if it is first up.[88] Without any allegations that content was displayed on "judmathews.com" at that time, Judge Mehalchick was left with only one reasonable interpretation of Doe's pleadings about the "creation" or "publishment" of the website: they referred to his registration and ownership of the domain. At the very least, this conclusion does not constitute "direct, obvious, or observable error."[89]

## IV. CONCLUSION

Chief Magistrate Judge Mehalchick's prior assessment of the case is fair and well-founded: John Doe fails to allege that the Defendants' actions impinged on any constitutionally secured liberty or property interest or penalized protected First Amendment conduct. Doe's motion for reconsideration is therefore denied.

---

[87] *Id*. ¶¶ 140–41.
[88] *Id*.
[89] *In re Energy Future Holdings Corp.*, 904 F.3d at 312 (internal brackets omitted).

Further, the Court is compelled to issue an admonishment and warning. Doe aspires to be a member of the Bar. But his briefing is unbecoming of the profession. Certain language he uses and arguments he raises are patently offensive—deeply inflammatory but divorced from the facts and devoid of merit. We demand more from those in the legal profession.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge